CASE NO. 10-4494

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

CHASTITY SHIELDS, *et al.*,
*Plaintiff-Appellants*

v.

FEDEX CUSTOMER INFORMATION SERVICES, INC.,
*Defendant-Appellee*

On Appeal from the United States District Court
for the Southern District of Ohio
Civil Action No: 09-00309

BRIEF OF THE DEFENDANT-APPELLEE
FEDEX CUSTOMER INFORMATION SERVICES, INC.

Elizabeth Low
FEDERAL EXPRESS CORPORATION
Legal Department – Litigation
Building B, Second Floor
3620 Hacks Cross Road
Memphis, Tennessee 38125
(901) 434-8629
(901) 434-4523 fax
elizabeth.low@fedex.com
Attorney for Defendant-Appellee

## CORPORATE DISCLOSURE STATEMENT

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?

**Yes.**

If the answer is YES, list below the identity of the parent corporation or affiliate and the relationship between it and the named party.

**Defendant-Appellee FedEx Customer Information Services, Inc. is a wholly owned subsidiary of non-party FedEx Corporate Services, Inc.; and FedEx Corporate Services, Inc. is a wholly owned subsidiary of non-party FedEx Corporation which is a publicly traded company.**

2.    Is there a publicly owned corporation, not a party to the appeal that has a financial interest in the outcome?

**Yes.**

If the answer is YES, list the identity of such corporation and the nature of the financial interest:

**FedEx Corporation and FedEx Corporate Services, Inc., as the parent corporations of FedEx Customer Information Services, Inc., may have a financial interest in the outcome.**

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ................................................................................ ii

TABLE OF AUTHORITIES ........................................................................... iv

STATEMENT REGARDING ORAL ARGUMENT ............................................ vii

JURISDICTIONAL STATEMENT ................................................................... 1

STATEMENT OF THE ISSUES ...................................................................... 2

STATEMENT OF THE CASE ......................................................................... 3

STATEMENT OF THE FACTS ....................................................................... 5

SUMMARY OF THE ARGUMENT ................................................................ 11

ARGUMENT AND CITATION OF AUTHORITY ............................................. 15

    I.     STANDARD OF REVIEW ................................................................. 15

    II.    APPELLANTS CANNOT ESTABLISH ANY BASIS FOR
            EMPLOYER LIABILITY. ................................................................ 16

          A. FCIS Exercised Reasonable Care To Prevent And Correct
             Promptly Any Harassing Behavior ................................................. 17

               1. FCIS exercised reasonable care in implementing a
                  policy to prevent and correct sexual harassment ................ 18

               2. FCIS acted promptly to eliminate any sexually
                  harassing behavior ............................................................ 20

               3. FCIS's Policy was effective in practice to reasonably
                  prevent and correct any harassing behavior in January
                  2007 ............................................................................... 22

a. *The January 2007 discipline of Klingenberg did not place FCIS on notice of Klingenberg's misconduct regarding Appellants*................................ 24

b. *The January 2007 discipline of Klingenberg was a reasonable response to Klingenberg's conduct* ....... 27

B. Appellants Unreasonably Failed To Take Advantage Of Any Preventive Or Corrective Opportunities Provided By FCIS ......... 31

1. Appellants unreasonably chose not to report their allegations of harassment to FCIS....................................... 31

2. Appellants unreasonably chose not to use the complaint procedure provided by the FCIS Anti-Harassment Policy............................................................... 34

III. WILLIAMS AND DAVIS CANNOT ESTABLISH A *PRIMA FACIE* CASE FOR THEIR HOSTILE WORK ENVIRONMENT CLAIMS ................................................................. 39

A. Davis' Alleged Work Environment................................................ 41

B. Williams' Alleged Work Environment ......................................... 43

C. Davis And Williams Cannot Establish That Klingenberg Subjected Them To A Hostile Work Environment....................... 47

CONCLUSION ........................................................................................... 50

CERTIFICATE OF COMPLIANCE ...................................................... 52

CERTIFICATE OF SERVICE................................................................. 53

ADDENDUM............................................................................................... 54

DESIGNATION OF RELEVANT COURT DOCUMENTS ................................. 55

UNPUBLISHED CASES........................................................................... 57

# TABLE OF AUTHORITIES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ................................................................... 15

Anderson v. Memphis Bd. of Educ., 75 F. Supp. 2d 786 (W.D. Tenn. 1999) ................................................................................. 27

Adams v. O'Reilly Automotive Inc., 538 F. 2d 926, (8th Cir. 2008) ................................................................................... 33

Barner v. Hayes, 399 F.3d 745 (6th Cir. 2005) ........................................ 31

Black v. Zaring Homes, Inc., 104 F.3d 822 (6th Cir. 1997) ..................................... 50

Blankenship v. Helton, 123 F.3d 868, 874 (6th Cir. 1997) ..................................... 27

Blankenship v. Parke Care Centers, Inc., 913 F. Supp. 1045, (S.D. Ohio 1995) ................................................................................. 39

Bowman v. Shawnee State Univ., 220 F.3d 456 (6th Cir. 2000) ..................... 40, 49

Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998) ............................................................. passim

Clark v. UPS, 400 F.3d 341 (6th Cir. 2005) ................................. 18, 22, 49

Dees v. Johnson Controls World Services, Inc., 168 F.3d 417 (11th Cir. 1999) ................................................................................. 25, 26

EEOC v. Harbert-Yeargin, Inc. 266 F.3d 498 (6th Cir. 2001) ..................... 16-17, 24

Engel v. Rapid City School Dist., 506 F.3d 1118 (8th Cir. 2007) ........................... 29

Faragher v. City of Boca Raton, 524 U.S. 775, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998) ............................................................. passim

Fenton v. HiSAN, Inc., 174 F.3d 827 (6th Cir. 1999) ........................... 28

Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263 (6th Cir. 2009) ................................................................................. 35

Gorzynski v. Jetblue Airways Corp., 596 F.3d 93 (2d Cir. 2010). ......................... 32

Grace v. USCAR, 521 F.3d 655 (6th Cir. 2008)...................................................... 49

Harris v. Forklift Sys., Inc., 510 U.S. 17, 114 S. Ct. 367, 126 L. Ed. 2d
295 (1993)............................................................................................................... 39

Hafford v. Seidner, 183 F.3d 506 (6th Cir. 1999)...................................................... 16

Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321 (6th Cir. 2008)................... *passim*

Hurley v. The Atlantic City Police Dep't., 174 F.3d 95 (3d Cir. 1999) ................ 29

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106
S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ....................................................................... 15

Morris v. Oldham County Fiscal Court, 201 F.3d 784 (6th Cir. 2000) ................. 50

Reed v. MBNA Marketing Systems, Inc., 333 F.3d 27 (1st Cir. 2003)................. 38

Shaw v. AutoZone, Inc., 180 F.3d 806 (7th Cir. 1999) ........................................... 35

Thornton v. Fed. Express Corp., 530 F.3d 451 (6th Cir. 2008) ................. 16, 35, 38

Torres v. Pisano, 116 F.3d 625 (2d Cir. 1997)........................................................ 22

Walton v. Johnson & Johnson Servs., Inc., 347 F.3d 1272 (11th Cir.
2003))...................................................................................................................... 35

Williams v. Ford Motor Co., 187 F.3d 533 (6th Cir. 1999).............................. 15, 40

Williams v. General Motors Corp., 187 F. 3d 553 (6th Cir.
1999)........................................................................................................30-31

Williams v. Missouri Dep't of Mental Health, 407 F.3d 972 (8th Cir.
2005)...................................................................................................................... 35

## Statutes

Ohio Rev. Code. § 4112.02, et seq....................................................................... 15

**Rules**

Fed. R. Civ. P. 56(c) ..................................................................................... 15

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Defendant-Appellee FedEx Customer Information Services, Inc. does not believe oral argument is necessary in this case. As the facts and legal arguments are adequately set forth in this brief, Defendant-Appellee submits that the decision process would not be significantly aided by oral argument.

## JURISDICTIONAL STATEMENT

This is an appeal of an order granting Defendant-Appellee's Motion for Summary Judgment which was entered on November 2, 2010 in the United States District Court of the Southern District of Ohio by the Honorable Sandra S. Beckwith. On December 21, 2010, a Judgment and a Memorandum Opinion were entered setting forth the Court's analysis and the reasons for the Order.

The District Court had original diversity jurisdiction pursuant to 28 U.S.C. § 1332 and jurisdiction upon removal by Defendant-Appellee pursuant to 28 U.S.C. § 1441. This Court has jurisdiction of the appeal pursuant to 28 U.S.C. § 1291 allowing for review of all final decisions issued by a district court.

## <u>STATEMENT OF THE ISSUES</u>

1.      Whether Appellee is entitled to the <u>Ellerth</u>/<u>Faragher</u> affirmative defense to Appellants' hostile work environment claims.

Appellants answer "No."

Appellee answers "Yes."

2.      Whether the January 2007 discipline of James Klingenberg placed Appellee on notice of Klingenberg's alleged harassment of Appellants.

Appellants answer "Yes."

Appellee answers "No."

3.      Whether, under the <u>Ellerth</u>/<u>Faragher</u> affirmative defense, Appellants reasonably took advantage of Appellee's complaint procedure by telling the alleged harasser to stop.

Appellants answer "Yes."

Appellee answers "No."

4.      Whether Klingenberg's conduct with respect to Appellants Mercedes Davis and Angela Williams unreasonably interfered with their work performance creating a hostile work environment.

Appellants answer "Yes."

Appellee answers "No."

## STATEMENT OF THE CASE

On April 3, 2009, Plaintiff-Appellants Theah Barber, Mercedes Davis, and Angela Williams ("Plaintiffs") jointly filed a complaint against Defendant-Appellee FedEx Customer Information Services, Inc. ("FCIS") asserting their respective state law hostile work environment claims. Chastity Shields filed a separate complaint against FCIS asserting her claim for *quid pro quo* sexual harassment, among others. On May 5, 2009, FCIS removed both cases on the basis of diversity of citizenship. On September 30, 2009, the district court entered an Order consolidating the two cases for all purposes. Shields is not a party to this appeal.

For their claims, Plaintiffs each allege that James Klingenberg, their former FCIS manager, made unwelcome sexual advances towards them which resulted in a hostile work environment based on sexual harassment. On November 2, 2010, the district court entered an order granting FCIS' Motion for Summary Judgment. On December 21, 2010, the court below entered a Judgment and a Memorandum Opinion setting forth the court's analysis and the reasons for the Order. The district court held that FCIS was entitled to summary judgment on all of it's claims, reasoning that, in accordance with the Ellerth/Faragher affirmative defense, FCIS exercised reasonable care to prevent and correct promptly any alleged sexually

harassing behavior by Klingenberg, and Plaintiffs unreasonably failed to take advantage of the preventive and corrective opportunities provided by FCIS under its Anti-Harassment Policy.    <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998); <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998).

FCIS requests this Court to affirm the district court's order granting summary judgment in favor of FCIS because Plaintiffs fail to establish a genuine issue of material fact and FCIS is entitled to judgment as a matter of law based upon the <u>Ellerth</u>/<u>Faragher</u> affirmative defense.

## STATEMENT OF THE FACTS

### A.    The Parties

Barber and Williams are presently employed by FCIS as customer service representatives. (RE# 76-1, Deposition of Theah Barber ("Barber Depo.") 47:2-8; RE# 74-1, Deposition of Angela Williams ("Williams Depo.") 31:9-10).   Davis was employed by FCIS as a customer service representative from November 24, 2006 until she resigned in January 2008. (RE# 72-1, Deposition of Mercedes Davis ("Davis Depo.") 24:23-25; 35:23-36:5; 43:6-10). The general job duties of a customer service representative are to handle inbound calls, track packages, and assist customers.  (RE# 76-1, Barber Depo. 47:15-17).

Plaintiffs reported to James Klingenberg, a former FCIS manager at times relevant to this appeal. (RE# 76-1, Barber Depo. 54:5-12; RE# 74-1, Williams Depo. 34:16-17; RE# 72-1, Davis Depo. 40:9-41:5).   Howard Schmid was the Senior Manger for the call center.  (RE# 76-1, Barber Depo. 61:10-13).   Deborah Baur was the Human Resources representative for Appellants. (RE# 76-1, Barber Depo. 66:15-22; RE# 74-1, Williams Depo. 52:5-19; RE# 72-1, Davis Depo. 54:14-17).

Under the FCIS Anti-Harassment Policy (the "Policy"), FCIS prohibits any acts in its work environments that create the potential for

illegal harassment. (RE# 72-3, Deposition of Deborah Baur ("Baur Depo.") 34:3-25, Exhibit 3, Anti-Harassment Policy). The Policy includes the following pertinent provisions:

> FCIS prohibits any acts in its work environments that create the potential for illegal harassment. . .
>
> If any employee believes that he or she has been subjected to harassment by anyone, including supervisors, coworkers, vendors, or customers, he or she must immediately report this to management or Human Resources.
>
> Any employee who observes conduct that could be perceived as sexual or other harassment should immediately report that conduct to management or Human Resources.
>
> Any member of management who receives a report or complaint of sexual or other harassment must immediately report the complaint to Human Resources even if the complaining employee asks that no action be taken. Any manager who fails to take action upon receiving a complaint of harassment may be subject to discipline, up to and including discharge.

(RE# 72-3, Baur Depo. 34:3-25, Exhibit 3, Anti-Harassment Policy). Employees can access the Policy online through the FCIS intranet, and the Policy is described in the FCIS Employee Handbook. (RE# 72-4, Declaration of Deborah Baur ("Baur Dec."), ¶ 6).

Barber and Williams attended Sexual Harassment Awareness training on October 5, 2005. (RE# 72-4, Baur Dec., ¶¶ 9-10). Barber also attended Anti-Harassment training between 2006 and 2007. (RE# 76-1, Barber Depo. 68:12-69:16). Beginning in 2007, FCIS offered this training in an online

format. (RE# 72-4, Baur Dec., ¶ 11). Davis logged in to begin the Sexual Harassment Awareness for Employees training module on July 3, 2007, and she completed the training on January 18, 2008.[1] (RE# 72-4, Baur Dec., ¶¶ 12-13). Finally, Plaintiffs had access to the Policy online through the FCIS intranet, and the Policy was described in their FCIS Employee Handbook. (RE# 72-4, Baur Dec., ¶ 6).

### B. Frye approached Appellants to ask whether Klingenberg acted in an inappropriate manner.

Although Barber and Williams never reported Klingenberg's conduct to FCIS, in November 2007, Manager Pamela Frye, one of Klingenberg's peer managers, approached them individually and asked whether Klingenberg had ever acted in an inappropriate manner towards them. (RE# 76-1, Barber Depo. 74:13-17; RE# 74-1, Williams Depo. 54:24-55:3). Barber and Williams responded affirmatively to Frye and each described sexual comments that Klingenberg allegedly made to them. (RE# 76-1, Barber Depo. 71:18-24; RE# 74-1, Williams Depo. 54:24-55:3). Frye

---

[1] The record facts do not support Plaintiffs' assertion that "Davis was not aware of or afforded this type of training and indeed testified that she was not aware of the training, which was not available through the computer system until after November 2007." (Brief of Appellants, p. 4). Davis does not dispute that an online Sexual Harassment Awareness for Employee training module was available to her throughout her employment. Davis also does not dispute that she actually logged in to begin the online training module on July 3, 2007 but did not complete the course at that time.

approached Barber because Chastity Shields, Plaintiffs' co-worker, reported Klingenberg's conduct to Frye and suggested that Frye should also talk to Barber regarding Klingenberg's inappropriate behavior. (RE# 74-14, Deposition of Pamela Frye ("Frye Depo.") 179:6-180:25, Exhibit D, November 16, 2007 Memorandum).

After Frye approached Barber, Barber informed Davis that Barber had reported Klingenberg's conduct to Frye. (RE# 72-1, Davis Depo. 81:12-20). Barber informed Davis that, before Barber gave Davis' name to Frye, Barber wanted to be sure that Davis was comfortable talking to Frye. (RE# 72-1, Davis Depo. 82:14-25). Davis gave Barber permission to provide her name to Frye. (RE# 72-1, Davis Depo. 82:13-15).

Frye then informed Schmid, her Senior Manager, of the reports of Klingenberg's conduct. (RE# 74-14, Frye Depo. 181:1-4). In response, Schmid promptly ensured that Plaintiffs documented their complaints in accordance with the Policy. (RE# 74-2, Schmid Depo. 104:5-24). Frye requested Plaintiffs to document their complaints. (RE# 76-1, Barber Depo. 72:7-9, 135:15-18, Exhibit 7, Barber's Employee Information Form; RE# 74-1, Williams Depo. 55:23-56:1, 83:20-84:23, Exhibit 10, Williams' Employee Information Form; RE# 72-1, Davis Depo. 81:3-7, 90:20-23, Exhibit 7, Davis' Employee Information Form). After Plaintiffs submitted

their complaints, they never saw Klingenberg in the workplace again.[2] (RE# 76-1, Barber Depo. 243:10-19; RE# 74-1, Williams Depo. 167:10-19; RE# 72-1, Davis Depo. 156:15-20).

### C.    FCIS conducted an investigation and terminated Klingenberg's employment.

An investigation of Plaintiffs' complaints was conducted by Managing Director Marianne Mutter and Baur. (RE# 72-2, Schmid Depo. 105:15-18). As part of the investigation, Baur and Mutter interviewed Plaintiffs and witnesses identified in the complaints. (RE# 72-3, Baur Depo. 95: 7-96:6). As a result of the investigation, FCIS made the decision to terminate Klingenberg's employment. (RE# 72-3, Baur Depo. 96:7-11).

On January 23, 2008, Schmid instructed Klingenberg to report to a hotel where Mutter and Baur would meet with him to obtain his statement. (RE# 72-2, Schmid Depo. 107:8-11). Initially, Mutter placed Klingenberg on investigative suspension. (RE# 72-3, Baur Depo. 98:11-16; 97:21-25, Exhibit 7). There was a break after Baur and Mutter received Klingenberg's statement, and then they all returned to the hotel later that day, at which time

---

[2] Klingenberg called in sick on the day Plaintiffs submitted their complaints. (RE# 72-2, Schmid Depo. 106:23-107:2). Klingenberg was out sick for several days, and then he went on a medical leave of absence. (RE# 72-2, Schmid Depo. 107:2-3). During the leave of absence, Klingenberg was not permitted to be present at the call center or to have contact with anyone at the center until his medical leave was over on January 23, 2008. (RE# 72-2, Schmid Depo. 107:4-6).

Klingenberg's employment was terminated.    (RE# 72-2, Schmid Depo.
107:12-15).    Mutter terminated Klingenberg's employment on January 23,
2008.    (RE# 72-3, Baur Depo. 99:20-100:21; 98:3-6, Exhibit 8, Notification
of Termination).

## SUMMARY OF THE ARGUMENT

Plaintiff-Appellants Theah Barber, Angela Williams, and Mercedes Davis (collectively "Plaintiffs") were employed as customer service representatives in a call center of Defendant-Appellee FedEx Customer Information Services, Inc. ("FCIS"). Plaintiffs claim that they were each subjected to a hostile work environment based upon sexual harassment by James Klingenberg, a former FCIS manager. Although Plaintiffs were trained and aware that the FCIS Anti-Harassment Policy prohibits illegal harassment, and requires an employee who believes she has been subjected to harassment to report it to management or Human Resources, no Plaintiff ever made any such complaint or report to FCIS.

However, in November 2007, FCIS manager Pamela Frye approached Plaintiffs individually and asked whether Klingenberg had ever acted in an inappropriate manner towards them. Plaintiffs each confirmed that Klingenberg had acted inappropriately, and Frye immediately directed them to document their complaints. FCIS responded promptly by suspending Klingenberg and conducting an investigation of Plaintiffs' complaints. As a result of the investigation, FCIS terminated Klingenberg's employment. In this way, FCIS acted promptly to eliminate any sexually harassing behavior by Klingenberg.

Notwithstanding FCIS's properly promulgated and enforced Anti-Harassment Policy, and despite Plaintiffs' unreasonable failure to take advantage of the preventive and corrective opportunities provided under FICS's policy, Plaintiffs argue that FCIS is not entitled to the Ellerth/Farragher affirmative defense. First, Plaintiffs erroneously argue that FCIS failed to enforce its effective Anti-Harassment Policy in January 2007 when FCIS disciplined Klingenberg for sending inappropriate messages to Appellants' co-worker Chastity Shields.[3] Plaintiffs theorize that, in January 2007, FCIS would have been notified of Klingenberg's alleged harassment of Plaintiffs, because Shields would have reported Klingenberg's inappropriate conduct with respect to Plaintiffs had FCIS approached Shields. (Brief of Appellants, p. 14). However, the district court below aptly characterized Plaintiffs' theory as mere speculation. Moreover, the January 2007 discipline of Klingenberg did not place FCIS on notice of Klingenberg's alleged misconduct with respect to Barber, Davis, and/or Williams.

---

[3] In the court below, Shields alleged a *quid pro quo* sexual harassment claim against FCIS based on Klingenberg's misconduct. Shields' claim was resolved in the court below, and Shields is not a party to this appeal. .Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998).

Plaintiffs also contend that, had FCIS disciplined Klingenberg more severely in January 2007, he would have been deterred from allegedly harassing Plaintiffs. However, Plaintiffs' sheer guesswork as to the deterrent effect of the discipline imposed by FCIS is likewise simply improper speculation and does not support a conclusion that FCIS failed to properly enforce its Anti-Harassment Policy.    Furthermore, the January 2007 discipline of Klingenberg was a reasonable response to, and effectively corrected, Klingenberg's misconduct.

Second, contrary to Plaintiffs' admission in the district court that each failed to complain about Klingenberg's conduct, Plaintiffs now argue that they did report Klingenberg's conduct to FCIS by directly requesting Klingenberg to stop.    However, notwithstanding the impropriety of advancing a new argument on appeal, complaining directly to an alleged harasser who seeks to conceal his misconduct does not fulfill an employee's duty under Ellerth/Faragher to alert the employer to her allegedly hostile work environment.

Finally, contrary to Plaintiffs' assertion that the district court held that Plaintiffs met their evidentiary burdens to prove their claims of hostile work environment (Brief of Appellants, p. 7), the district court merely *assumed*, but did not embark upon such analysis, that Klingenberg subjected the

Plaintiffs to a sexually hostile work environment. Furthermore, Davis and Williams cannot make out a *prima facie* case that Klingenberg's conduct was sufficiently severe or pervasive to rise to the level of a hostile work environment.

Plaintiffs fail to establish the existence of any genuine issue of material fact, and FCIS is entitled to judgment as a matter of law. For these reasons, the district court did not err by granting summary judgment in favor of FCIS based upon the Ellerth/Faragher affirmative defense.

## ARGUMENT AND CITATION OF AUTHORITY

### I.    STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of summary judgment. Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 332 (6th Cir. 2008). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Plaintiffs assert hostile work environment claims pursuant to the Ohio Civil Rights Act, Ohio Rev. Code. § 4112.02, et seq. Federal evidentiary standards and burdens of proof apply to claims of employment discrimination filed pursuant to the Ohio Civil Rights Act. Williams v. Ford Motor Co., 187 F.3d 533, 538 (6th Cir. 1999). Therefore, Title VII case law applies to Plaintiffs' claims. Id.

## II.    APPELLANTS CANNOT ESTABLISH ANY BASIS FOR EMPLOYER LIABILITY.

Under Title VII, "[i]n order to establish a prima facie case of hostile work environment based on sexual harassment, the plaintiff must show by a preponderance of the evidence: (1) that she was a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) that there is a basis for employer liability." Thornton v. Fed. Express Corp., 530 F.3d 451, 455 (6th Cir. 2008) (citing Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999)).

In this matter, Plaintiffs have not and cannot show that there exists any basis upon which FCIS is liable for Klingenberg's conduct.  With respect to the fifth element of *respondeat superior* liability, in a supervisor harassment case in which the supervisor takes no tangible employment action against the plaintiff, the employer is subject to vicarious liability "unless the employer affirmatively shows that it 'exercised reasonable care to prevent and correct promptly any sexually harassing behavior,' and that the plaintiff 'unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm

otherwise.'" EEOC v. Harbert-Yeargin, Inc., 266 F.3d 498, 510 (6th Cir. 2001) (citing Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807).

In this case, Appellants do not dispute that they did not experience a materially adverse employment action. (RE# 122, Memorandum Opinion, p. 9). Moreover, FCIS exercised reasonable care to prevent and correct any sexually harassing behavior, and Plaintiffs each unreasonably failed to take advantage of any preventive or corrective opportunities provided by FCIS and to avoid harm otherwise.

### A.  FCIS Exercised Reasonable Care To Prevent And Correct Promptly Any Harassing Behavior.

FCIS used reasonable care to prevent and correct Klingenberg's allegedly harassing behavior. First, as recognized by the district court, FCIS properly implemented an Anti-Harassment Policy through employee handbook publications and employee training. (RE# 122, Memorandum Opinion, pp. 9-11). In addition, in November 2007 when FCIS became aware of Klingenberg's inappropriate conduct towards Plaintiffs, FCIS immediately conducted an investigation, excluded Klingenberg from the call center property during the investigation, and then terminated Klingenberg's employment. Therefore, FCIS's Policy was effective in practice to reasonably prevent and immediately correct any harassing behavior. Consequently, Plaintiffs cannot establish a genuine issue of material fact to

dispute that FCIS exercised reasonable care to prevent and correct any harassing behavior by Klingenberg.

**1. FCIS exercised reasonable care in implementing a policy to prevent and correct sexual harassment.**

"To succeed in an affirmative defense against a vicarious sexual harassment claim for a hostile environment, a defendant must show by a preponderance of the evidence that it exercised reasonable care in implementing a policy to prevent and correct sexual harassment and that the plaintiff unreasonably failed to take advantage of that policy." Idusuyi v. Tenn. Dep't of Children's Servs., 30 Fed. Appx. 398, 403 (6th Cir. 2002) (citing Faragher, 524 U.S. at 806-07). "While there is no exact formula for what constitutes a 'reasonable' sexual harassment policy, an effective policy should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) and provide for training regarding the policy." Clark v. UPS, 400 F.3d 341, 349-50 (6th Cir. 2005) (internal citations omitted).

Under the FCIS Anti-Harassment Policy ("Policy"), FCIS prohibits any acts in its work environments that create the potential for illegal harassment. (RE# 72-3, Baur Depo. 34:3-25, Exhibit 3, Anti-Harassment

Policy).    Plaintiffs do not dispute that the Policy meets the basic requirements outlined by this Court in <u>Clark</u>.  First, under the FCIS Policy, supervisors are required to report sexual harassment and are subject to discipline for non-compliance.[4]    (<u>Id.</u>)    Second, the Policy permits both informal and formal complaints to be made to any manager or to Human Resources.[5]  (<u>Id.</u>)  Third, the Policy allows a report to be made to Human Resources where necessary to bypass a harassing supervisor.[6]  (<u>Id.</u>)

In addition, employees can access the Policy online through the FCIS intranet, and the Policy is described in the FCIS Employee Handbook.  (RE# 72-4, Baur Dec., ¶ 6).    Finally, FCIS provided training to employees regarding the Policy.    Barber and Williams attended Sexual Harassment Awareness training on October 5, 2005.  (RE# 72-4, Baur Dec., ¶¶ 9-10).  Barber also attended Anti-Harassment training between 2006 and 2007.  (RE# 76-1, Barber Depo. 68:12-69:16).  Beginning in 2007, FCIS offered

---

[4] "Any member of management who receives a report or complaint of sexual or other harassment must immediately report the complaint to Human Resources even if the complaining employee asks that no action be taken. Any manager who fails to take action upon receiving a complaint of harassment may be subject to discipline, up to and including discharge."
[5] "Any employee who observes conduct that could be perceived as sexual or other harassment should immediately report that conduct to management or Human Resources."
[6] "If any employee believes that he or she has been subjected to harassment by anyone, including supervisors, coworkers, vendors, or customers, he or she must immediately report this to management or Human Resources."

this training in an online format. (RE# 72-4, Baur Dec., ¶ 11). Davis logged in to begin the Sexual Harassment Awareness for Employees training module on July 3, 2007, and she completed the training on January 18, 2008. (RE# 72-4, Baur Dec., ¶¶ 12-13).

Accordingly, Plaintiffs do not dispute that FCIS properly implemented a Policy to prevent and correct sexual harassment.

### 2. FCIS acted promptly to eliminate any sexually harassing behavior.

Despite the properly promulgated Anti-Harassment Policy, Plaintiffs each unreasonably chose not to report Klingenberg's conduct to FCIS. Although Barber and Williams were aware of the Policy, received the FCIS Employee Handbook, and were able to use the FCIS intranet to view the FCIS policies (RE# 76-1, Barber Depo. 68:12-19, 68:4-7, 46:16-19; RE# 74-1, Williams Depo. 53:2-6, 29:13-30:23), both unreasonably chose not to report Klingenberg's conduct.

Despite Plaintiffs' refusal to report the alleged misconduct on their own, in November 2007, Frye approached Barber and Williams asking whether Klingenberg had ever acted in an inappropriate manner towards them, at which time they disclosed their complaints. (RE# 76-1, Barber Depo. 71:13-17; RE# 74-1, Williams Depo. 54:24-55:3). Additionally, Frye asked Barber whether she was aware of any other employee who believed

that Klingenberg had acted inappropriately; and with Davis' permission, Barber provided Davis' name to Frye.[7]  (RE# 72-1, Davis Depo. 81:14-82:15).  Frye instructed Plaintiffs to document their complaints regarding Klingenberg's conduct.  (RE# 76-1, Barber Depo. 72:7-9, 135:15-18, Exhibit 7, Barber's Employee Information Form; RE# 74-1, Williams Depo. 55:23-56:1, 83:20-84:23, Exhibit 10, Williams' Employee Information Form; RE# 72-1, Davis Depo. 81:3-7, 90:20-23, Exhibit 7, Davis' Employee Information Form).  After Plaintiffs submitted their complaints, they never saw Klingenberg in the workplace again.  (RE# 76-1, Barber Depo. 243:10-19; RE# 74-1, Williams Depo. 167:10-19; RE# 72-1, Davis Depo. 156:15-20).

In response to Plaintiffs' complaints, FCIS conducted an investigation.  (RE# 72-2, Schmid Depo. 105:15-18).  As a result of the investigation, FCIS terminated Klingenberg's employment.  (RE# 72-3, Baur Depo. 96:7-11; 99:20-100:21; 98:3-6, Exhibit 8, Notification of Termination; RE# 72-2, Schmid Depo. 106:23-107:14).  In this way, FCIS

---

[7] Although Davis claims that she was not aware that FCIS had an Anti-Harassment Policy (RE# 72-1, Davis Depo. 38:6-8), Davis' purported lack of knowledge of the Policy does not render FCIS's actions unreasonable under Ellerth/Faragher.  An employer's "'reasonableness' does not require that every single employee know the intricacies of the policy." Idusuyi, 30 Fed. Appx. at 403.  Moreover, Davis admits that she received the Employee Handbook containing the Policy during orientation, and that she could have reviewed the Policy online. (RE# 72-1, Davis Depo. Pp. 29-30).

acted promptly to eliminate any harassing behavior by Klingenberg. Indeed, Plaintiffs admit that FCIS's response upon notice of Klingenberg's conduct towards Barber and Williams in November 2007 was the "proper procedure." (Brief of Appellants, p. 13).

### 3. FCIS's Policy was effective in practice to reasonably prevent and correct any harassing behavior in January 2007.

"Prong one of the affirmative defense requires an inquiry that looks behind the face of a policy to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior." Clark, 400 at 349 (citations omitted). "[O]nce an employer has knowledge of the harassment, the law imposes upon the employer a duty to take reasonable steps to eliminate it." Id. (citing Torres v. Pisano, 116 F.3d 625, 636-37 (2d Cir. 1997)). Notwithstanding that FCIS was not aware of Klingenberg's misconduct with respect to Barber, Davis and/or Williams until November 2007, Plaintiffs argue erroneously that FCIS failed to properly enforce the Policy in January 2007 when FCIS disciplined Klingenberg for sending inappropriate messages to Appellants' coworker Shields.

In January 2007, Manager Robert Williams contacted Schmid regarding inappropriate messages sent by Klingenberg to Shields through the

WAVE scheduling system. (RE# 98-6, Williams Dec., ¶¶ 7-9). Although Williams believed that the messages were improper use of the WAVE system, and contained inappropriate content for a manager to send to a customer service representative, Williams did not conclude that the messages constituted harassment. (RE# 98-6, Williams Dec., ¶ 9). Williams had no basis upon which to form any opinions regarding any non-professional relationship between Shields and Klingenberg since he worked in Chicago and did not interact directly with them. (RE# 98-6, Williams Dec., ¶ 9). In light of the messages, Schmid placed Klingenberg on investigative suspension and conducted an investigation. (RE# 76-2, Schmid Depo. 39:5-40-4; 48:1-4, Exhibit 5 Klingenberg's Statement). Schmid believed that the messages were of a personal nature, as in a personal relationship or affair with Shields, which was inappropriate conduct for a manager. (RE# 76-2, Schmid Depo. 59:4-8). Consequently, Schmid severely disciplined Klingenberg by issuing a Warning Letter for leadership failure in violation of the Acceptable Conduct Policy, the Computer Resources Policy, and the Anti-Harassment Policy. (RE# 76-2, Schmid Depo. 53:23-54:6; 61:3-5, Exhibit 6 Warning Letter).

    **a.**  **_The January 2007 discipline of Klingenberg did_**
       **_not place FCIS on notice of Klingenberg's_**
       **_misconduct regarding Appellants._**

  First, Plaintiffs erroneously argue that FCIS was aware of Klingenberg's alleged harassment of Plaintiffs as early as January 2007 when FCIS disciplined Klingenberg. Specifically, Plaintiffs claim that "[i]f Schmid would have conducted a thorough investigation and interviewed Co-Plaintiff Shields in January 2007, she intended to report what she knew regarding the harassment of Plaintiffs." (Brief of Appellants, p. 14). However, as properly analyzed by the district court, "[t]his is just speculation." (RE# 122, Memorandum Opinion, p. 12). The district court also properly concluded that "it is just as likely that Shields would not have said anything about being harassed by Klingenberg had she been approached." (RE# 122, Memorandum Opinion, p. 12).

  Moreover, this Court has confirmed that a history of harassing behavior is not constructive notice to the employer reasoning that "if this argument were correct then employers would have constructive notice in every case where there is sexual harassment because, to be actionable, the harassment must be severe or pervasive." Harbert-Yeargin, Inc., 266 F.3d at 518; see also Leugers v. Pinkerton Security and Investigative Services, 2000 U.S. App. LEXIS 1831, *9-10 (6th Cir. Feb. 3, 2000) (Coworker's earlier

complaint "did not put defendant on notice because defendant investigated the complaint and found no basis to conclude that harassment had occurred.").

Likewise, in Hawkins, 517 F.3d at 344, this Court addressed the sexual harassment claims of multiple plaintiffs regarding the same alleged harasser, similar to the case at bar. Id. at 326. Notwithstanding the employer's previous investigation of complaints by the Hawkins plaintiffs Cunningham and Hill, which concluded that the alleged harasser "did behave in a sexually inappropriate manner with both," id. at 329, this Court held that the employer's response to plaintiff Hawkins' subsequent complaint regarding the same alleged harasser was sufficient to preclude employer liability. Id. at 344. In response to Hawkins' complaint, the employer "promptly launched an investigation, suspended [the alleged harasser], then fired him." Id. The Hawkins Court did not impose constructive notice of the harassment of Hawkins on the employer because Cunningham and Hill complained previously about the same harasser. Id. Rather, the Hawkins Court distinguished the employer's response to Hawkins' subsequent complaint as "markedly different from its response to the earlier complaints." Id. Accordingly, in this case, FCIS's January 2007 investigation of Klingenberg's messages to Shields simply does not impute

notice to FCIS of Klingenberg's alleged harassment of Barber, Davis, and/or Williams. Moreover, in contrast with the first investigation in <u>Hawkins</u>, Shields did not report her allegations of harassment to FCIS and FCIS did not conclude that there existed sexual harassment in January 2007.

With respect to the issue of notice, Plaintiffs look to <u>Dees v. Johnson Controls World Services, Inc.</u>, 168 F.3d 417 (11th Cir. 1999) to establish that an employer may be liable despite immediate and appropriate corrective action in response to a complaint of harassment, if it had knowledge of the harassment prior to the complaint and took no corrective action. (Brief of Appellants, pp. 20-21). The <u>Dees</u> plaintiff testified that an assistant chief had complained to Human Resources on Dees behalf, and that a human resources employee had heard of Dees' complaint. <u>Id.</u> at 423. Thus, the <u>Dees</u> court held that there was an issue of material fact as to whether the employer had notice of the alleged harassing conduct before Dees complained. In contrast to <u>Dees</u>, Plaintiffs adduce no record facts to show that FCIS had any notice of Plaintiffs' complaints before they were approached by Frye. Finally, unlike the employer in <u>Dees,</u> FCIS responded promptly and reasonably to Klingenberg's conduct in January 2007 upon notice of Plaintiffs' complaints.

### b.   The January 2007 discipline of Klingenberg was a reasonable response to Klingenberg's conduct.

"An employer's response to a report of sexual harassment must be proportionate to the severity of the alleged misconduct." Barna v. City of Cleveland, Nos. 96-3971, 96-4178, 97-4130, 1998 U.S. App. LEXIS 31986, *12 (6th Cir. Dec. 22, 1998).   The propriety of an employer's response should be measured at the time the response is made.   Even if "hindsight shows that these measures may not have been sufficient, they were appropriate at the time and easily satisfy the 'good faith' standard." Blankenship v. Helton, 123 F.3d 868, 874 (6th Cir. 1997) (citations omitted); see also Anderson v. Memphis Bd. of Educ., 75 F. Supp. 2d 786, 796 (W.D. Tenn. 1999).

In this case, Schmid believed that Klingenberg responded honestly during the January 2007 investigation, and Schmid believed that Klingenberg's misconduct of "[s]ending personal messages to a direct report . . . crossed the line of professionalism between a manager and a direct report." (RE# 98-8, Schmid Depo. 75:13-86:16; Exhibit 7 Klingenberg's Performance Review).   Schmid recognized that Klingenberg's conduct created the potential for illegal harassment.   (RE# 76-2, Schmid Depo. 56:20-57:18).   In this way, FCIS's response to Klingenberg's misconduct

was proportionate to the severity of the alleged misconduct as measured at the time the discipline was issued by Schmid.

Moreover, according to Shields, Klingenberg's behavior improved after he was suspended. (RE# 74-14, Frye Depo. 174:8-175:13, Exhibit D, November 16, 2007 Memorandum). Shields admits that, after Klingenberg was disciplined in January 2007, in the workplace, Klingenberg no longer called Shields into his office to make sexual advances (RE# 78-2, Shields Depo. 225:17-226:17), and no longer took Shields off the phone for side-by-side reviews to discuss his personal life. (RE# 78-2, Shields Depo. 225:17-226:17). Consequently, by issuing the severe disciplinary Warning Letter to Klingenberg, FCIS's reasonable steps to eliminate Klingenberg's misconduct were indeed effective even in retrospect.

Companies that take affirmative steps reasonably calculated to prevent and end harassment such as sending letters emphasizing the company's policies and the seriousness of the allegations against them, and threatening harassers with serious discipline if future allegations are substantiated, are likely to be deemed to have responded appropriately. Hawkins, 517 F.3d at 342-43; see also Fenton v. HiSAN, Inc., 174 F.3d 827, 831 (6th Cir. 1999) (holding that employer exhibited good faith remedial action by informing alleged harasser he was to stop making offensive comments and his failure

to comply would result in disciplinary action).  In January 2007, Schmid responded reasonably and proportionately to the circumstances to eliminate Klingenberg's misconduct by issuing a Warning Letter to Klingenberg that included a serious warning that "it is very important that you understand that any additional letter, while you are a manager in FCIS, will result in termination of your employment."  (RE# 76-2, Schmid Depo. 71:9-25; Exhibit 6 Warning Letter).

However, with misplaced reliance upon Hurley v. The Atlantic City Police Dep't., 174 F.3d 95 (3d Cir. 1999), Plaintiffs argue that an employer's proper response to an employee's complaint of harassment can be rendered unreasonable if the employer also previously ignored complaints by other employees about the same harasser.  (Brief of Appellants, p. 20).  However, Plaintiffs misapprehend the Hurley case in which the Third Circuit addressed only the issue of the admissibility of evidence of other acts of harassment.  Hurley, 174 F.3d at 109-12.  The Hurley court also concluded that evidence of employees' lack of respect for an employer's sexual harassment policy is extremely relevant to the issue of the effectiveness the policy.  Id. at 111.  In stark contrast to Hurley and Dees, FCIS did not ignore Klingenberg's misconduct in either January or November 2007.

"A company faced with a pattern of harassment must both respond appropriately and take increasingly effective steps designed to end the harassment."  Hawkins, 517 F.3d at 344; see also Engel v. Rapid City School Dist., 506 F.3d 1118, 1126 (8th Cir. 2007) ("The reasonableness of an employer's response to repeated sexual harassment 'may well depend on whether the employer progressively stiffens its discipline…"). While FCIS's response to Klingenberg's initial misconduct in January 2007 was a severe Warning Letter, in November 2007, FCIS responded to Klingenberg's subsequent misconduct with the ultimate increasingly effective step to end the harassment: FCIS exercised its previous warning to Klingenberg that any further misconduct would result in termination.

Indeed, contrary to Plaintiffs' argument that FCIS showed indifference to Klingenberg's conduct (Brief of Appellants, p. 13), FCIS properly enforced its Policy in practice by reasonably preventing and immediately correcting Klingenberg's conduct in January 2007. Consequently, Plaintiffs fail to establish any genuine issue of material fact to defeat summary judgment as FCIS used reasonable care as required under the first prong of the Ellerth/Faragher affirmative defense.  Moreover, Plaintiffs' premise that Shields "intended to report what she knew" (Brief of Appellants, p. 14) is not only speculative, but is contrary to Plaintiffs' duty

30

under Ellerth/Faragher to alert FCIS to their allegedly hostile work environment.

**B.    Appellants Unreasonably Failed To Take Advantage Of Any Preventive Or Corrective Opportunities Provided By FCIS.**

The demonstration of a plaintiff's failure to use the employer's complaint procedure will normally suffice to satisfy the employer's burden to prove that the plaintiff unreasonably failed to take advantage of preventive or corrective opportunities. Williams v. General Motors Corp., 187 F.3d 553, 567 (6th Cir. 1999) (citing Ellerth, 118. S. Ct. at 2270). In this case, Plaintiffs cannot establish a genuine issue of material fact based on the record facts to establish that they reasonably took advantage of the preventive opportunities offered under FCIS's Anti-Harassment Policy.

**1.    Appellants unreasonably chose not to report their allegations of harassment to FCIS.**

Although in the court below, Plaintiffs expressly admitted that they did not report their allegations of harassment,[8] they now argue that "because the Plaintiffs complained about the harassment to Klingenberg, FCIS is not entitled to the Faragher/Ellerth affirmative defense." (Brief of Appellants, p.

---

[8] "Barber and all of the Plaintiff's in this case have testified that they did not report the harassment for the fear of losing their jobs." (RE# 89-2, Barber's Response to Motion for Summary Judgment, p. 9; see also RE# 92-2, Williams' Response to Motion for Summary Judgment, p. 7; RE# 95-2, Davis' Response to Motion for Summary Judgment, p. 7).

24).    Specifically, Plaintiffs allege that "all of the Plaintiffs complained directly to Klingenberg about his harassment towards them, telling him to stop." (Brief of Appellants, p. 24).

Even accepting as true that requesting the harasser to stop suffices as a complaint of harassment, Plaintiff's new argument on appeal following the district court's unfavorable order is improper.  See Barner v. Hayes, 399 F.3d 745, 749 (6th Cir. 2005) ("Our function is 'to review the case presented to the district court, rather than a better case fashioned after a district court's unfavorable order.'  For that reason, 'it is well settled law that this court will not consider an error or an issue which could have been raised below but was not.'").

Moreover, Plaintiffs misconstrue Gorzynski v. Jetblue Airways Corp., 596 F.3d 93 (2d Cir. 2010).  They erroneously argue that an employee who complains to the harasser, if that person is designated in the employer's policy as a proper person with whom to lodge such a complaint, reasonably took advantage of the employer's preventive opportunities under the second prong of the Ellerth/Faragher affirmative defense.  Neither does Gorzynski go so far, nor does this Court enforce such a rule.  See, e.g., Balding-Margolis v. Cleveland Arcade, 352 Fed. Appx. 35, 44 (6th Cir. 2009) (holding that, under second prong of Ellerth/Faragher affirmative defense,

plaintiff failed to take advantage of employer's complaint procedure where plaintiff's deposition testimony indicates that she never complained to anyone concerning the harassment and discriminatory conduct other than the harasser himself).  The <u>Gorzynski</u> court only held that "an employer is not, as a matter of law, entitled to the *Faragher/Ellerth* affirmative defense simply because an employer's sexual harassment policy provides that the plaintiff could have complained to other persons as well as the alleged harasser." <u>Id.</u> at 105.  Notably, the Second Circuit reasoned that "it may be unreasonable for a victim of harassment to complain only to the harasser because, as a realistic and practical matter, there are other channels that are adequately indicated and are accessible and open." <u>Id.</u>

In this case, Barber, Davis, and Williams each knew how to contact either their human resources representative or other manager who did not work at the call center site.  (RE# 76-1, Barber Depo. 61:10-63:4; RE# 74-1, Williams Depo. 52:5-20; RE# 72-1, Davis Depo. 56:17-20).  Moreover, as borne out in November 2007, Frye was also quite receptive to Plaintiffs' complaints.  "Only when sexual harassment is exposed to scrutiny can it be eliminated; thus it makes sense to encourage victims of sexual harassment to come forward because . . . they are often the only ones, besides the perpetrators, who are aware of sexual harassment." <u>Adams v. O'Reilly</u>

Automotive, Inc., 538 F.2d 926, 933 (8th Cir. 2008) (reasoning that "[t]o excuse a victim from the duty to alert the proper authorities through proper channels specifically discourages the best hope of exposing and eliminating sexual harassment."). Thus, to the extent that Plaintiffs request that Klingenberg stop suffices as a complaint under the Policy, Plaintiffs failure to use the accessible and open channels was an unreasonable failure to expose Klingenberg's conduct to FCIS' scrutiny.

### 2. Appellants unreasonably chose not to use the complaint procedure provided by the FCIS Anti-Harassment Policy.

Although Plaintiffs were all aware of the Policy, they unreasonably chose not to report their allegations of harassment to FCIS. Notwithstanding their numerous explanations for their failure to take advantage of the corrective opportunities available under the Policy, Plaintiffs failure to complain was unreasonable.

First, Barber and Williams attempt to excuse their failure to report, because they were afraid they would be fired. (RE# 76-1, Barber Depo. 72:15-18; RE# 74-1, Williams Depo. 55:4-17). Barber also imagined that Klingenberg would retaliate against her for causing him to lose his job: "I was thinking he was the sole provider for his family. He may want to kill somebody if he lost his job." (RE# 76-1, Barber Depo. 85:3-11). However,

Klingenberg never directly threatened to harm or fire Barber and Williams; but Klingenberg allegedly suggested that "Wendy's is hiring or looking for good employees, or McDonald's." (RE# 76-1, Barber Depo. 200:18-22; RE# 74-1, Williams Depo. 55:18-21, 95:11-12). Klingenberg also allegedly commented to Barber "I better not go to the CSI group, I would be sorry." (RE# 76-1, Barber Depo. 201:9-13). Nonetheless, "an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under <u>Ellerth</u> to alert the employer to the allegedly hostile environment." <u>Thornton</u>, 530 F.3d at 457 (finding the plaintiff had not adduced evidence demonstrating that she was under a "credible threat of retaliation") (citing <u>Williams v. Missouri Dep't of Mental Health</u>, 407 F.3d 972, 977 (8th Cir. 2005); <u>Shaw v. AutoZone, Inc.</u>, 180 F.3d 806, 813 (7th Cir. 1999); <u>Walton v. Johnson & Johnson Servs., Inc.</u>, 347 F.3d 1272, 1290-91 (11th Cir. 2003)).

As properly concluded by the district court "[t]hese fears, however, are insufficient to excuse an employee from reporting harassment." <u>Thornton</u>, 530 F.3d at 457 ("[A]n employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under Ellerth to alert the employer to the allegedly hostile environment."). Instead, the plaintiff must produce evidence that she was

under a credible threat of retaliation. <u>Gallagher v. C.H. Robinson Worldwide, Inc.</u>, 567 F.3d 263, 276 (6th Cir. 2009). In this case, the district court correctly determined that Klingenberg's threats to Plaintiffs that "Wendy's and McDonald's are hiring" were too vague to constitute credible threats of retaliation. (RE# 122, Memorandum Opinion p. 13).

Second, Barber claims that she chose not to report Klingenberg's conduct, because she believed that the managers were friends with Klingenberg, and "once another manager knew, that they would sort of conspire, I guess, to get rid of me instead of truly resolving the issue." (RE# 76-1, Barber Depo. 78:4-14). Barber explains that "Jim told us that all the – that the managers would do dinners randomly together, like you know, at your house this week and their house that week. So I assumed that was because they were social." (RE# 76-1, Barber Depo. 81:24-82:3). Similarly, Williams claims that Klingenberg instructed her not to trust any other managers. (RE# 74-1, Williams Depo. 56:2-6). Williams also alleges that she believed that the managers were friends with Klingenberg and the managers would never believe her. (RE# 74-1, Williams Depo. 96:16-22). Likewise, Davis concluded that she would not report Klingenberg's conduct because of his relationship with the other managers. (RE# 72-1, Davis Depo. 113:13-17). However, in <u>Idusuyi</u>, 30 Fed. Appx. at 403, the Sixth

Circuit held that the plaintiff, who justified her silence by claiming that she thought complaining would be futile in light of the harasser's relationship with company leaders, unreasonably passed her own judgment about how effectively the employer's sexual harassment policies operated. In the same way, in this case, Plaintiffs unreasonably passed their own judgment about the effectiveness of the Policy. Moreover, contrary to Plaintiffs' suspicions otherwise, FCIS promptly investigated their complaint (RE# 72-2, Schmid Depo. 105:15-18), and stopped Klingenberg's conduct through his immediate termination.    (RE# 72-3, Baur Depo. 99:20-100:21; 98:3-6, Exhibit 8, Notification of Termination).

Third, Barber and Davis explain that they did not report Klingenberg's conduct because they did not know who to tell. (RE# 76-1, Barber Depo. 84:16-21; RE# 72-1, Davis Depo. 118:10-119:17). Barber had thought about reporting Klingenberg's conduct, but chose not to do so, and she did not review the FCIS Anti-Harassment Policy at the time. (RE# 76-1, Barber Depo. 182:18-183:15). Although Barber attended Anti-Harassment training (RE# 76-1, Barber Depo. 68:12-69:16), Barber testified in her deposition that she erroneously assumed that she could only report Klingenberg's conduct to either her manager or her manager's manager. (RE# 76-1, Barber Depo. 183:16-184:2). Barber's and Davis' failure to

report Klingenberg's conduct due to alleged ignorance of the policy was clearly unreasonable as they both received training and received handbooks that contained the Policy.

Finally, Barber and Williams unreasonably assumed that reporting Klingenberg's conduct would be futile. Barber testified that she "figured what would really be the benefit of me telling on him, which would just cause me to work in a disgruntled environment? . . . And I felt Jim would still be there in the environment, or eventually they would get rid of me." (RE# 76-1, Barber Depo. 150:18-25). Similarly, Williams claims that she believed that she would be fired instead of Klingenberg, because he "has got away with it before." (RE# 74-1, Williams Depo. 57:1-7). Thus, Barber and Williams unreasonably passed judgment upon their employer's application of the FCIS Anti-Harassment Policy, and unilaterally concluded that reporting Klingenberg's conduct pursuant to the FCIS policy would be futile. They were wrong. And, their own unqualified judgment regarding the operation of the FCIS policy was unreasonable, Idusuyi, 30 Fed. Appx. at 404, and did not alleviate their duty under Ellerth to alert FCIS about her allegedly hostile work environment, Thornton, 530 F.3d at 457. See also Reed v. MBNA Marketing Systems, Inc., 333 F.3d 27, 36 (1st Cir. 2003) ("[G]eneral statements by a supervisor that a complaint will be futile or will

get the employee in trouble cannot be an automatic excuse for failing to use the complaint mechanism.").

## III.    WILLIAMS AND DAVIS CANNOT ESTABLISH A *PRIMA FACIE* CASE FOR THEIR HOSTILE WORK ENVIRONMENT CLAIMS.

Contrary to Plaintiffs' assertion that "the trial court has reasoned that Klingenberg subjected all of the Plaintiffs to a sexually hostile work environment" (Brief of Appellants, p. 7), the district court only assumed that each Plaintiff could establish a *prima facie* case for their hostile work environment claims.  (RE# 122, Memorandum Opinion, p. 9).  However, Plaintiffs Davis and Williams fail to establish that Klingenberg's conduct was sufficiently severe or pervasive to rise to the level of a hostile work environment.

"Whether misconduct rises to the level of a hostile work environment is a legal question that may be decided on a summary judgment motion." Stacy v. Shoney's, Inc., 1998 U.S. App. LEXIS 6659, *9 (6th Cir. Mar. 31, 1998) (citing Blankenship v. Parke Care Centers, Inc., 913 F. Supp. 1045, 1051 (S.D. Ohio 1995), aff'd. 123 F.3d 868 (6th Cir. 1997).  "For any sexual harassment preceding [an] employment decision to be actionable ... the conduct must be severe or pervasive." Ellerth, 524 U.S. at 754.  "Except in cases of truly egregious conduct, a workplace does not become a hostile

work environment on the basis of isolated incidents of harassment." Howington v. Quality Rest. Concepts, LLC, 298 Fed. Appx. 436, 443 (6th Cir. 2008). "Rather, Plaintiff must show that her workplace was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" Id. (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).

"To determine whether a work environment is 'hostile' or 'abusive,' courts look at the totality of the circumstances." Hawkins, 517 F.3d at 333 (citing Harris, 510 at 23; Williams, 187 F.3d at 562). The factors to be considered include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. "Both an objective and a subjective test must be met: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." Bowman v. Shawnee State Univ., 220 F.3d 456, 463 (6th Cir. 2000). In this case, Davis and Williams cannot meet this burden to establish that Klingenberg subjected them to a hostile work environment.

## A.   <u>Davis' Alleged Work Environment</u>

Davis claims that the alleged harassment began in November 2006 when she started working for FCIS. (RE# 72-1, Davis Depo. 57:9-12). For the next year, Klingenberg's alleged offensive conduct was comprised of comments on Davis' appearance, five to ten text messages, five to ten phone calls, four invitations to drinks, and two isolated incidents during which Klingenberg allegedly touched Davis.

*Comment:*   Davis did not find Klingenberg's initial comments to be offensive. (RE# 72-1, Davis Depo. 190:13-19). Klingenberg's initial comments included: "you look nice today . . . I like your pants, you're so beautiful." (RE# 72-1, Davis Depo. 190:13-19). Klingenberg's comments then changed to: "I like the way this shirt fits on you;" "I like the way you look in those jeans;" "you have a nice body;" and "you're arousing me with that shirt." (RE# 72-1, Davis Depo. 190:20-191:5). Although Klingenberg's comments were "constant" (RE# 72-1, Davis Depo. 60:24), Davis just ignored Klingenberg and did not respond. (RE# 72-1, Davis Depo. 61:6-9). It was not until Davis received a text message from Klingenberg in September 2007 that Davis "knew that something wasn't - - wasn't right." (RE# 72-1, Davis Depo. 21:1-7).

*Cell Phone:*    In June or July 2007, Klingenberg obtained Davis' cell phone number when she used her personal cell phone to return a call to Klingenberg, who was away from the office. (RE# 72-1, Davis Depo. 71:9-11; 191:18-192:10). When Klingenberg answered the call, he allegedly said "now that I have your phone number, I can call you and talk dirty to you. Hope your boyfriend doesn't mind. You can call me Uncle Perv." (RE# 72-1, Davis Depo. 192:1-5). Thereafter, Klingenberg sent five to ten text messages to Davis' phone. (RE# 72-1, Davis Depo. 72:23-73:3). Klingenberg also allegedly called Davis' cell phone in the evening or on the weekend between five to ten times, but Davis did not answer. (RE# 72-1, Davis Depo. 71:14-25).

In September 2007, Klingenberg sent Davis a text message "that he liked the way my ass looked in my jeans, and that I was his favorite, and then that I should use my looks to my advantage" and "I hope your boyfriend will not get mad." (RE# 72-1, Davis Depo. 21:1-22:6). The day after Davis received this message, Klingenberg apologized at work, and Davis informed Klingenberg that she "did not appreciate it; it was inappropriate." (RE# 72-1, Davis Depo. 75:5-12). At that point, Klingenberg stopped sending text messages to Davis. (RE# 72-1, Davis

Depo. 75:14-15). Prior to that last message, the other text messages that Klingenberg sent were short greetings. (RE# 72-1, Davis Depo. 190:9-12).

*Four Invitations to Drink:* Klingenberg invited Davis for drinks four times. (RE# 72-1, Davis Depo. 192:11-17). One time, Klingenberg left a note on Davis' desk. (RE# 72-1, Davis Depo. 192:18-20). Another time, in the summer, Klingenberg contacted Davis' grandmother (who was listed as Davis' emergency contact) and left a message for Davis to call Klingenberg; when Davis returned the call, Klingenberg asked her to have a beer with him. (RE# 72-1, Davis Depo. 192:21-193:2). Davis was not able to describe the remaining two times.

*Two Isolated Touching Incidents*: On a couple of occasions, Klingenberg placed his hand on Davis' leg while they were meeting one-on-one at the manager's station on the call center floor, and the touch never lasted for more than two seconds. (RE# 72-1, Davis Depo. 137:10-139:16).

## B.    **Williams' Alleged Work Environment**

Williams testified that the Klingenberg's inappropriate behavior was comprised of comments,[9] text messages, and an isolated incident during which Klingenberg placed a candy bar in Williams' pocket. (RE# 74-1, Williams Depo. 77:10-16).

---

[9] Williams uses the term "gestures" interchangeably with "comments." (RE# 74-1, Williams Depo. 66:5-18).

*Comments*:  Klingenberg allegedly commented to Williams that "You have a nice butt, you have nice legs, you look good in that skirt." (RE# 74-1, Williams Depo. 69:6-11).  Klingenberg also commented that "Your jeans should be a little bit tighter.  Maybe you should show a little bit more cleavage."  (RE# 74-1, Williams Depo. 69:12-16).  Klingenberg also commented to Ms. Williams "what color undergarments do you have on. And by the way, what size is your bra?" (RE# 74-1, Williams Depo. 93:6-13).  Klingenberg also invited Williams go on vacation with him, but Williams declined.  (RE# 74-1, Williams Depo. 90:24-91:14).  In addition, when Williams confided in Klingenberg about her money troubles, Klingenberg suggested that she should be a stripper, but Williams responded that she did not like that idea.  (RE# 74-1, Williams Depo. 106:1-107:13). Finally, Klingenberg wrote notes to Williams once or twice, and the notes included comments like "[w]ould you meet me after work."  (RE# 74-1, Williams Depo. 76:16-77:9).

Klingenberg commented in this manner to Williams daily.  (RE# 74-1, Williams Depo. 69:20-25).  Williams considered Klingenberg's comments to be "flirting, horseplay, and joking."  (RE# 74-1, Williams Depo. 69:6-19). Williams described Klingenberg's comments: "he would just talk about what I wore, or what do I have - - my lingerie, what do I have on underneath my

clothes, but he never went to the other level." (RE# 74-1, Williams Depo. 66:5-11). Only after Williams learned that Klingenberg had made comments to her coworkers, did she believe that Klingenberg's comments were more than just joking. (RE# 74-1, Williams Depo. 73:8-13). Williams believed that the sexual nature of the comments that Klingenberg made to her co-workers Chastity Shields and Theah Barber were more severe than the nature of the comments that Klingenberg made to Williams. (RE# 74-1, Williams Depo. 135:1-136:1). Williams believed that Klingenberg was more flirtatious and more explicit with Shields and Barber than with Williams. (RE# 74-1, Williams Depo. 133:3-10).

*Text Messages*:    Williams voluntarily gave her cell phone number to Klingenberg when Williams asked Klingenberg to assist her boyfriend with plumbing work at her boyfriend's barber shop. (RE# 74-1, Williams Depo. 104:8-16; 78:24-79:20). About one year after the verbal comments started, Williams alleges that Klingenberg began sending text messages to Williams' cell phone. (RE# 74-1, Williams Depo. 74:4-12). Klingenberg allegedly sent text messages two to three times per day, every day. (RE# 74-1, Williams Depo. 76:2-8). Williams did not respond to Klingenberg's text messages. (RE# 74-1, Williams Depo. 94:11-13). Klingenberg also called

Williams' cell phone on her days off from work, but she did not answer and he did not leave messages. (RE# 74-1, Williams Depo. 94:14-22).

Williams did not save a record of the text messages, but the messages are recorded in a memo prepared by Pam Frye when Williams documented her complaint at Frye's request. (RE# 74-1, Williams Depo. 74:13-75:4). Frye recorded the following messages in a November 20, 2007 memo to Howard Schmid:

| Date and Time | Message |
|---|---|
| 10/26/2007 17:50 | Tting in my JUNK just cause ur HOT!:) call me i miss u |
| 9/27/2007 19:36 | U need 2 b my frnd n no my marriage is shot So give Break on potty mouth pls don't say I hit on ur cute Ass @ work or 2 u best frnd atleas |
| 9/21/2007 18:49 | Cool still wanna take u 2 boating |
| 9/21/2007 17:52 | I wanna get alonna grab something 2 eat @ a sportsbar Get off @ close |
| 7/03/2007 09:51 | Nothing just want 2 flirt 4 got how good in jeans N ur hair is really cute like that |

(RE# 74-14, Frye Depo. 192:5-193:23, Exhibit E, November 20, 2007 Memorandum).

*Isolated Candy Bar Incident:*    Klingenberg allegedly walked by and placed a Snicker bar in Williams' back pocket "so he could touch my butt" while Williams was kneeling in her chair at work. (RE# 74-1, Williams

Depo. 66:25-67:1, 120:19-121:24).   Klingenberg's hand just brushed her, and "if somebody else is paying attention, it doesn't look what it is."  (RE# 74-1, Williams Depo. 121:20-24).   Williams also alleges that Klingenberg attempted to brush up against Williams when he walked by, and that made Williams uncomfortable.  (RE# 74-1, Williams Depo. 67:15-21).

### C.   <u>Davis and Williams cannot establish that Klingenberg subjected them to a hostile work environment.</u>

Klingenberg's alleged behavior towards Williams was comprised of sexual comments, text messages, and one isolated incident.  (RE# 74-1, Williams Depo. 77:10-16).   Although Williams can establish that Klingenberg's allegedly harassing conduct was frequent, Williams did not subjectively believe that Klingenberg's conduct was offensive.  Williams described Klingenberg's comments as "flirting, horseplay, and joking." (RE# 74-1, Williams Depo. 69:6-19).   Williams only came to view Klingenberg's comments as more than just joking when Williams learned that Klingenberg made comments to others.  (RE# 74-1, Williams Depo. 73:8-13).   Moreover, Williams did not believe that the nature of the comments that Klingenberg made to her was severe.  Williams believed that the sexual nature of the comments that Klingenberg made to her co-workers Shields and Barber was severe in nature compared to the  comments that Klingenberg made to her.   (RE# 74-1, Williams Depo. 135:1-136:1).

Williams believed that Klingenberg was more flirtatious and more explicit with Shields and Barber than with her. (RE# 74-1, Williams Depo. 133:3-10). In addition, Klingenberg's conduct was not physically threatening to Williams. (RE# 74-1, Williams Depo. 95:23-24). Finally, Williams did not find that Klingenberg's conduct distracted her from being able to stay focused on the customers. (RE# 74-1, Williams Depo. 157:5-14).

Likewise, over a period of one year, Klingenberg's allegedly inappropriate conduct towards Davis was limited to the following: (1) made constant comments; (2) sent five to ten text messages and called five to ten times; (4) made four invitations to drinks; and (5) touched Davis' leg for not more than two seconds on two occasions. (RE# 72-1, Davis Depo. 189:15-193:10). However, this evidence is wholly inadequate to satisfy an objective test. "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher, 118 S. Ct. at 2283 (internal citations omitted). Although Davis alleges that she was subjectively offended by Klingenberg's conduct (but voluntarily chose not report it), Davis cannot show that Klingenberg's conduct was severe or pervasive enough to create an objectively hostile work environment.

Although Klingenberg's comments and text messages may have offended Davis and Williams, "[n]ot all offensive conduct is actionable as harassment. See Stacy v. Shoney's, Inc., 1998 U.S. App. LEXIS 6659 at *8. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher, 118 S. Ct. at 2283 (internal citations omitted). "[T]he work environment as a whole must be considered rather than a focus on individual acts of alleged hostility." Grace v. USCAR, 521 F.3d 655, 679 (6th Cir. 2008) (citing Bowman, 220 F.3d at 463).

In this case, Klingenberg's allegedly harassing conduct might have been frequent, but it did not rise to the level of a hostile work environment. See Stacy v. Shoney's, Inc., 1998 U.S. App. LEXIS 6659 at *10 (holding that sexually suggestive comments, leering looks, calls to the plaintiff's home to tell her that he missed her, and touching the plaintiff's breast while removing an ink pen from her shirt pocket were offensive but not sufficiently frequent, severe, physically threatening, or humiliating to unreasonably interfere with the plaintiff's work performance to constitute actionable work place harassment); Clark, 400 F.3d at 351 (holding that a period of two and a half years of vulgar jokes, placing a vibrating pager on

the plaintiff's thigh, and pulling at the plaintiff's overalls when she told him she was wearing a thong falls short of being sufficiently pervasive, hostile, or abusive to support a legal claim of hostile work environment); Bowman, 220 F.3d at 464 (holding that a shoulder rubbing incident, an incident in which the alleged harasser grabbed the plaintiff's buttocks, a comment at the swimming pool, and incident in which the alleged harasser pressed her hands on the plaintiff's chest and pushed him toward the door, were, notwithstanding the physical invasions, serious but did not constitute conduct that was severe or pervasive); Morris v. Oldham County Fiscal Court, 201 F.3d 784, 790 (6th Cir. 2000) (holding that alleged harasser's dirty jokes, verbal sexual advance, reference to the plaintiff as "Hot Lips," and isolated comments about the plaintiff's state of dress did not amount to discriminatory changes in the terms and conditions of a plaintiff's employment, but were simple teasing, offhand comments, and isolated incidents); Black v. Zaring Homes, Inc., 104 F.3d 822, 826 (6th Cir. 1997) (holding that sex-based comments were merely offensive but not severe or pervasive enough to create an objectively hostile work environment).

## CONCLUSION

For the foregoing reasons, FCIS submits the district court did not err in granting summary judgment in favor of FCIS on all of the claims of

Barber, Davis, and Williams; and FCIS respectfully requests that this Court affirm the Order.

Respectfully submitted,

s/*Elizabeth Low*
Elizabeth Low

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). This brief was prepared in proportional typeface using Times New Roman (14-point) font. It contains 11,390 words.

s/*Elizabeth Low*_____
Elizabeth Low

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing Principal Brief of the Defendant-Appellee FedEx Customer Information Services, Inc. was served by FedEx delivery on this 13th day of April, 2011, addressed to the following:

David E Stenson, Esq.
Stenson & Associates
120 W. Second Street
Suite 1210
Dayton, OH 45402


*/s/ Elizabeth Low*
Elizabeth Low

# **<u>ADDENDUM</u>**

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

R. 71 -- Defendant FedEx Customer Information Services, Inc.'s Motion for Summary Judgment as to the Claims of Plaintiff Mercedes Davis

R. 72 – Memorandum of Law in Support of Defendant FedEx Customer Information Services, Inc.'s Motion for Summary Judgment as to the Claims of Plaintiff Mercedes Davis

R. 73 -- Defendant FedEx Customer Information Services, Inc.'s Motion for Summary Judgment as to the Claims of Plaintiff Angela Williams

R. 74 – Memorandum of Law in Support of Defendant FedEx Customer Information Services, Inc.'s Motion for Summary Judgment as to the Claims of Plaintiff Angela Williams

R. 75 -- Defendant FedEx Customer Information Services, Inc.'s Motion for Summary Judgment as to the Claims of Plaintiff Theah Barber

R. 76 – Memorandum of Law in Support of Defendant FedEx Customer Information Services, Inc.'s Motion for Summary Judgment as to the Claims of Plaintiff Theah Barber

R. 99 – Reply to Response to Defendant FedEx Customer Information Services, Inc.'s Motion for Summary Judgment as to the Claims of Plaintiff Theah Barber

R. 100 – Reply to Response to Defendant FedEx Customer Information Services, Inc.'s Motion for Summary Judgment as to the Claims of Plaintiff Angela Williams

R. 101 – Reply to Response to Defendant FedEx Customer Information Services, Inc.'s Motion for Summary Judgment as to the Claims of Plaintiff Mercedes Davis

R. 114 -- Order Granting Motions for Summary Judgment as to Claims of Plaintiffs Theah Barber, Angela Williams, Mercedes Davis

R. 122 -- Memorandum Opinion

R. 121 -- Notice of Appeal

R. 123 -- Judgment

## **UNPUBLISHED CASES**

Balding-Margolis v. Cleveland Arcade, 352 Fed. Appx. 35 (6th Cir. 2009).................................................................................................. 32

Barna v. City of Cleveland, Nos. 96-3971, 96-4178, 97-4130, 1998 U.S. App. LEXIS 31986 (6th Cir. Dec. 22, 1998) .................................................... 26

Howington v. Quality Rest. Concepts, LLC, 298 Fed. Appx. 436 (6th Cir. 2008)................................................................................................... 39

Idusuyi v. Tenn. Dep't of Children's Servs., 30 Fed. Appx. 398 (6th Cir. 2002) ............................................................................ 18, 21, 36, 38

Leugers v. Pinkerton Security and Investigative Services, 2000 U.S. App. LEXIS 1831 (6th Cir. Feb. 3, 2000) ............................................... 24

Stacy v. Shoney's, Inc., 1998 U.S. App. LEXIS 6659 (6th Cir. Mar. 31, 1998) ............................................................................. 39, 48, 49

867081v2



LEXSEE 352 FED APPX 35

**TAMRA BALDING-MARGOLIS; STEVEN MARGOLIS, Plaintiffs-Appellants, v. CLEVELAND ARCADE, dba HYATT REGENCY CLEVELAND; et al., Defendants-Appellees.**

No. 09-3017

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

*09a0732n.06; 352 Fed. Appx. 35; 2009 U.S. App. LEXIS 24604; 2009 FED App. 0732N (6th Cir.)*

November 9, 2009, Filed

**NOTICE:** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. *SIXTH CIRCUIT RULE 28(g)* LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE *RULE 28(g)* BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** [**1]
ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO.

**COUNSEL:** For TAMRA BALDING-MARGOLIS, STEVEN MARGOLIS, Plaintiffs - Appellants: Sylvester Summers, Jr., Law Office, Cleveland, OH.

For CLEVELAND ARCADE, dba Hyatt Regency Cleveland, GLOBAL HYATT CORPORATION, JOEY SCHULTZ, Outlets Manager, STEPHEN STEWART, General Manager, WENDY LEUDERS, Human Resources Director, Hyatt Regency Cleveland, DONALD J. MURTAUGH, Chief of Security, Hyatt Regency Cleveland, HYATT CORPORATION, Defendants - Appellees: Alison M. Day, Littler Mendelson, Columbus, OH.

**JUDGES:** Before: O'CONNOR, * Associate Justice (Ret.); MOORE and COOK, Circuit Judges.

\* The Honorable Sandra Day O'Connor, Associate Justice (Ret.) of the United States Supreme Court, sitting by designation.

**OPINION BY:** KAREN NELSON MOORE

**OPINION**

[*37] **KAREN NELSON MOORE, Circuit Judge.** Plaintiff-Appellant Tamra Balding-Margolis ("Balding-Margolis") appeals from the district-court order granting summary judgment in favor of Defendants-Appellees Hyatt Corporation and several Hyatt employees (collectively "Hyatt") with regard to her claims of sexual harassment, [*38] wage discrimination, gender discrimination, retaliation, wrongful discharge, intentional infliction of emotional [**2] distress, and negligent hiring. She also appeals the district-court order granting Hyatt's motion to strike her post-deposition affidavit. For the reasons explained below, we **AFFIRM** the district court's judgment.

**I. BACKGROUND**

The Hyatt Regency Cleveland at the Arcade hired Balding-Margolis, a forty-five year old female, to work as a server at the restaurant "The 1890." During her tenure, Balding-Margolis's immediate supervisor was Joseph Schultz, and Schultz's immediate supervisor was Joseph Serreyn. Balding-Margolis was a member of UNITE HERE Local 10, and a collective-bargaining agreement ("CBA") governed Balding-Margolis's employment. In addition to her serving duties, Balding-Margolis worked as a trainer for Hyatt's on-the-job train-

Case: 10-4494    Document: 006110927196    Filed: 04/13/2011    Page: 67

Page 2

352 Fed. Appx. 35, *; 2009 U.S. App. LEXIS 24604, **;
2009 FED App. 0732N (6th Cir.)

ing program. The CBA was silent as to the pay rate for training, but prior to accepting the position, Balding-Margolis agreed to accept an alternative pay arrangement.

Upon employment, Balding-Margolis received copies of several documents related to employee behavior. The first was Hyatt's Policy Against Harassment, which explicitly forbade harassment and retaliation on numerous grounds including gender and age. Balding-Margolis testified that she understood [**3] that she was entitled to bring concerns under the policy to her immediate supervisor, the Director of Human Resources, the Hyatt General Manager, or a Hyatt hotline. Balding-Margolis also received a copy of Hyatt's Associate Handbook, which outlined the "open door policy" at Hyatt. That policy stated that any employee was entitled to bring a complaint about any work-related problem to his or her immediate supervisor, the Director of Human Resources, or the General Manager. Balding-Margolis also received a copy of the Rules and Regulations for Cash Handling Personnel ("Cash Handling Rules"), and she agreed to follow the instructions set forth therein. Balding-Margolis was aware, in fact, that failure to follow the Cash Handling Rules could result in immediate termination. Relevant to this appeal, the Cash Handling Rules generally prohibited an employee from altering a guest check; required that an employee follow proper procedures; and prohibited an employee from handling checks, cash, and credit cards in an improper manner. The restrictions on altering a guest check included prohibitions on changing the tip amount or closing out a check that differed in any way from the customer's signed [**4] receipt.

Despite her knowledge of the Cash Handling Rules, Balding-Margolis committed various violations. In October 2005, she was issued a warning when two guests left the restaurant without providing a valid form of payment. In January 2006, Balding-Margolis received another warning because of a large cash variance following her shift. In May 2006, Balding-Margolis received a third warning--a "Final Written Warning"--for adding an additional eighteen-percent gratuity without the customer's permission.

On May 9, 2007, at the close of the shift, Schultz noted that Balding-Margolis's gratuities equaled 32.29% of her total sales before the inclusion of cash tips. The high tips-to-sales ratio was suspicious and caused Schultz to audit Balding-Margolis's transactions that day. Schultz concluded that there were problems with one-third of Balding-Margolis's sales, including receipts for discounted meals that lacked the required discount coupons; ten checks without a signed copy of the room charge, credit card, or other documentation; and [*39] two unsigned receipts with listed tips that exceeded the

actual food-sales amount. Schultz conducted an audit of the two workers with whom Balding-Margolis [**5] had been serving that day but found no similar discrepancies.

Based on the number of problems with Balding-Margolis's transactions, Schultz conducted an additional audit of Balding-Margolis's shifts on April 25, May 1 through 4, and May 8, 2007. The Hyatt Controller, Michael Ciuni, oversaw this audit. When the audit revealed additional policy violations, Schultz and the Human Resources Director, Wendy Leuders, recommended that Hyatt terminate Balding-Margolis. The General Manager, Stephen Stewart, and Ciuni both approved the termination decision after reviewing the audit documentation. Schultz and Leuders met with Balding-Margolis on May 12, 2007, and notified Balding-Margolis of her termination for violations of the Cash Handling Rules and misappropriation of hotel funds. Balding-Margolis was given the opportunity to explain the various discrepancies, but she failed to do so.

During the termination meeting, Balding-Margolis made general complaints regarding the way that Schultz had administered the staff, but she made no complaints of sex- or age-based discrimination or harassment. Following her termination, Hyatt continued auditing Balding-Margolis's receipts for five dates in April [**6] 2007, revealing additional discrepancies. Because Balding-Margolis had alleged during her termination meeting that Schultz was attempting to get her fired and that he had papered her file and/or stolen the supporting documentation that she needed to explain the discrepancies, Hyatt conducted an audit of Balding-Margolis's transactions during a two-week period prior to Schultz's employment at Hyatt. That audit revealed similar cash-handling problems. Hyatt also conducted an audit of all the checks closed out by the servers on April 25, May 1 through 4, and May 8, 2007, and found that none of them had discrepancies or cash-handling violations similar to Balding-Margolis's discrepancies.

Balding-Margolis [1] filed suit against Hyatt [2] on October 30, 2007 in the U.S. District Court for the Northern District of Ohio. [3] Balding-Margolis's complaint asserted [*40] eleven state and federal claims. Following discovery, including a sworn deposition by Balding-Margolis, Hyatt submitted a motion for summary judgment. In support of her brief in opposition, Balding-Margolis submitted a sworn affidavit, which Hyatt moved to strike. The district court granted summary judgment and also granted Hyatt's motion [**7] to strike Balding-Margolis's affidavit to the extent that it conflicted with her deposition testimony. Balding-Margolis filed a timely appeal raising numerous claims.

1 Balding-Margolis's husband, Steven Margolis, was a plaintiff in the case filed in the district

Case: 10-4494    Document: 006110927196    Filed: 04/13/2011    Page: 68

Page 3

352 Fed. Appx. 35, *; 2009 U.S. App. LEXIS 24604, **;
2009 FED App. 0732N (6th Cir.)

court based on his assertion of a claim for loss of consortium. Although Steven Margolis is listed as a party to the instant appeal, the brief on appeal does not present argument regarding the dismissal of the loss-of-consortium claim, and thus we refer to Balding-Margolis as the sole appellant. *See Robinson v. Jones, 142 F.3d 905, 906 (6th Cir. 1998)* ("Issues which were raised in the district court, yet not raised on appeal, are considered abandoned and not reviewable on appeal.").

2  Balding-Margolis originally named Cleveland Arcade, LLC; Global Hyatt Corporation; Hyatt Corporation; Old Arcade, LLC; Joey Schultz; Stephen Stewart; Wendy Lueders; and Donald Murtaugh as defendants. The district court dismissed Cleveland Arcade, LLC; Old Arcade, LLC; and Global Hyatt Corporation from the suit after finding none of them were Balding-Margolis's employer. Balding-Margolis has failed to appeal the district court's dismissal of these [**8] entities, and the issue is thus waived. *See Radvansky v. City of Olmsted Falls, 395 F.3d 291, 318 (6th Cir. 2005).* Hyatt Corporation and the above-mentioned Hyatt employees are the only remaining defendants.

3  Balding-Margolis initially filed a timely charge of discrimination with the EEOC, which issued a right to sue letter. The union also filed a grievance on her behalf for unjust termination, which it later withdrew. That grievance makes no mention of sexual harassment or discrimination. In response to the EEOC complaint and union grievance, Leuders conducted an investigation into Balding-Margolis's allegations of harassment and discrimination. Following a series of interviews with several of Balding-Margolis's former co-workers, Hyatt was unable to substantiate the claims. Hyatt did, however, issue Schultz a written warning for making unprofessional comments.

## II. ANALYSIS

"We review de novo a district court's grant of summary judgment." *Yeschick v. Mineta, 521 F.3d 498, 502 (6th Cir. 2008).* Summary judgment is warranted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant [**9] is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* "The moving party bears the burden of proving that there are no genuine issues of material fact," *Yeschick, 521 F.3d at 502,* but the nonmoving party "must present more than a mere scintilla of evidence in support of [its] position" to avoid summary judgment.

*Harrow Prods., Inc. v. Liberty Mut. Ins. Co., 64 F.3d 1015, 1019 (6th Cir. 1995).*

### A. Motion to Strike

Balding-Margolis claims that the district court improperly struck large portions of her post-deposition affidavit that were material to her claims and not directly contradictory to her deposition testimony. "[W]e review the district court's refusal to consider a portion of [an] affidavit for an abuse of discretion." *Briggs v. Potter, 463 F.3d 507, 511 (6th Cir. 2006).* "A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck & Co., 790 F.2d 453, 460 (6th Cir. 1986).* Thus, when determining whether to strike a post-deposition affidavit, the district court "must first determine whether the affidavit directly contradicts the nonmoving party's [**10] prior sworn testimony." *Aerel, S.R.L., v. PCC Airfoils, L.L.C., 448 F.3d 899, 908 (6th Cir. 2006).* If so, then the court must strike the affidavit "unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id.*

After an extensive review of the record, we conclude that the district court's decision to strike the portions of the affidavit that directly conflicted with Balding-Margolis's deposition testimony was not an abuse of discretion. Our review of the scope of the district court's order, however, is complicated by the fact that the court did not identify by paragraph number the specific portions of the affidavit that it believed directly conflicted with the deposition testimony. Instead, the court highlighted certain phrases that it found directly contradictory and summarized the remaining evidence once it had disregarded the portions of the affidavit that it determined were in conflict. Based on the evidence that the district court recounted as remaining, we believe the district court may have swept too broadly in excluding statements about the severity and pervasiveness of the alleged sexual harassment, as well as information about similarly [**11] situated co-workers. Nonetheless, any error is ultimately harmless. Even considering that evidence, as we do [*41] below, we conclude that Balding-Margolis fails to raise a material question of fact sufficient to survive summary judgment on any of her claims.

### B. Age-Discrimination Claims

Balding-Margolis contests the grant of summary judgment on her age-discrimination claims under the Age Discrimination in Employment Act ("ADEA") and the Ohio Revised Code. [4] She presents no direct evidence of age discrimination but argues that she is able to make out a prima facie case with circumstantial evidence. Balding-Margolis is mistaken; she is unable to show that

she was "replaced by a younger worker," *Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 521 (6th Cir. 2008)*, or that a similarly situated employee was treated more favorably. *See Wright v. Murray Guard, Inc., 455 F.3d 702, 707 (6th Cir. 2006)*. Although a twenty-six year old male bartender "was put on the schedule more on the restaurant side" after her termination, Pl. Dep. at 196-98, the employee was already working in the lounge when Balding-Margolis was fired, and there is no evidence that he was relieved of his duties or reassigned to perform [**12] Balding-Margolis's duties. "A person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Grosjean v. First Energy Corp., 349 F.3d 332, 336 (6th Cir. 2003)* (quotation omitted).

> 4   *Ohio Rev. Code § 4112.02* and *§ 4112.99*. Age-discrimination claims under Ohio law generally are analyzed under the same standards as federal AEDA claims. *Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 357 (6th Cir. 1998)*.

Balding-Margolis is also unable to establish that younger similarly situated employees were treated more favorably. As noted by the district court, the Sixth Circuit requires comparator employees to be similarly situated "in all *relevant* respects." *Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 353 (6th Cir. 1998)* (emphasis in original). Balding-Margolis submitted evidence of different treatment in the general disciplinary context. She claims that the younger employees' practice of marrying alcohol and their admitted [**13] but unproven failure to turn in receipts were sufficiently serious to merit comparison to the disciplinary violation that led to her termination--the cash-handling-policy violation and misappropriation of funds. *See Wright, 455 F.3d at 710*. This is not the case. Marrying alcohol may be a violation of Ohio law, but Balding-Margolis never engaged in the practice and was never disciplined for not participating. The fact that Balding-Margolis was terminated for engaging in an illegal practice does not automatically make marrying alcohol and Balding-Margolis's infraction comparable. Misappropriation of funds and marrying alcohol are different circumstances involving distinguishable conduct. *See Ercegovich, 154 F.3d at 352; Wright, 455 F.3d at 710*.

Balding-Margolis's allegations that her younger co-workers violated the Cash Handling Rules by failing to turn in their receipts or falsifying paperwork are also insufficient to satisfy her prima facie case. Balding-

Margolis states only that she just assumed her male co-workers were violating the policy but has presented no evidence that they actually did. Although Balding-Margolis did present evidence indicating that two younger female co-workers [**14] had violated the cash-handling procedures by not placing their receipts "in the right place," Pl. Dep. at 198, there is no [*42] record evidence that those receipts were altered or that the co-workers' actions were an intentional attempt to misappropriate funds and engage in fraudulent behavior. [5] *See id.* at 198-99. In sum, the co-workers' actions were sufficiently distinguishable from Balding-Margolis's. *See Ercegovich, 154 F.3d at 352; Wright, 455 F.3d at 710*. [6] Thus, we conclude that the district court did not err in granting summary judgment on the age-discrimination claims.

> 5   The district court improperly concluded that Balding-Margolis's post-deposition affidavit statements about one female co-worker could not be considered in determining "whether a younger employee was treated more favorably." Dist. Ct. Order at 11-12. Despite the lack of detail in Balding-Margolis deposition concerning this co-worker, nothing in the affidavit directly contradicts Balding-Margolis's deposition testimony-- the affidavit simply provides additional information. Given that the two employees were not similarly situated, however, the error was harmless.
>
> 6   Even assuming a prima facie case, we conclude that Hyatt [**15] is still able to "articulate [a] legitimate, nondiscriminatory reason for its actions," *Hollins v. Atl. Co., 188 F.3d 652, 658 (6th Cir. 1999)* (quotation omitted), and Balding-Margolis has not presented sufficient evidence to raise a question of fact as to whether Hyatt's reason for her termination--misappropriation of funds and cash-handling violations--is pretextual. *Id.*

## C. Wage Discrimination

Balding-Margolis next alleges that the district court improperly granted summary judgment on her wage claims under the Equal Pay Act ("EPA"), ADEA, Title VII, and Ohio Revised Code § 4112 because (1) she was paid less than other younger and/or male employees for her role as a server-trainer and (2) she was entitled to minimum wage (as opposed to her tipped rate) during training. Balding-Margolis fails to provide sufficient evidence to avoid summary judgment under any statutory provision.

With regard to her EPA and ADEA claims, Balding-Margolis has presented no evidence that she was paid less than co-workers outside of her protected class "'for

Case: 10-4494    Document: 006110927196    Filed: 04/13/2011    Page: 70

Page 5

352 Fed. Appx. 35, *; 2009 U.S. App. LEXIS 24604, **;
2009 FED App. 0732N (6th Cir.)

equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" [**16] *Beck-Wilson v. Principi, 441 F.3d 353, 359 (6th Cir. 2006)* (quoting *Corning Glass Works v. Brennan, 417 U.S. 188, 195, 94 S. Ct. 2223, 41 L. Ed. 2d 1 (1974)); see also Mickey, 516 F.3d at 522* (applying the same standard to an ADEA claim). Balding-Margolis concedes that she was the only server-trainer in Cleveland, and she has presented no evidence that other non-protected employees held "substantially equal" jobs and were paid more. *Beck-Wilson, 441 F.3d at 362.* Balding-Margolis further concedes that those employees who were paid a higher rate had greater seniority and were being paid pursuant to the provisions of the CBA. [7]

> [7]    The one piece of evidence that Balding-Margolis sets forth regarding varying wages is a conversation that she had with a Hyatt Corporate Trainer. Balding-Margolis alleges that during their meeting the individual informed Balding-Margolis that trainers at other hotels were paid more. First, it is unclear whether server-trainers outside Cleveland are valid comparators for a wage-discrimination claim, which requires equal pay for equal work in the same establishment. The EPA's governing regulations note that "establishment" refers to a distinct physical place of business, such that each physically [**17] separate place of business is ordinarily considered a separate establishment. *29 C.F.R. § 1620.9.* This definition leaves open the possibility of treating two physical locations as one establishment in cases where, for example, they are operationally indistinguishable. *Id.; see also Mowery v. Rite Aid Corp., 40 F. App'x 926, 927 (6th Cir. 2002)* (unpublished). Balding-Margolis, however, has presented no evidence regarding the operational structure of Hyatt and whether locations outside Cleveland can constitute the same establishment for EPA purposes. Furthermore, even if outside-Cleveland locations could constitute the same establishment, Balding-Margolis has failed to present any evidence to indicate that she was, in fact, paid a lower rate than people outside her protected class at those other locations apart from the bare, hearsay assertion that a Hyatt employee said they were.

[*43]    Balding-Margolis also fails to establish a prima facie case of wage discrimination under Title VII or *Ohio Revised Code § 4112.02.* "[A] Title VII plaintiff suing for wage discrimination (and, by extension, a plaintiff suing under *Ohio Rev. Code Ann. § 4112.02*) is not required, as part of her *prima facie* case, [**18] to point to a person of the opposite sex performing equal work for greater pay when there is other highly probative evidence that her salary would have been higher but for her sex." *Birch v. Cuyahoga County Probate Court, 392 F.3d 151, 163 (6th Cir. 2004).* Balding-Margolis, however, has presented no evidence, either direct or circumstantial, "that her salary would have been higher but for her sex." *Id.*

## D. Sexual-Harassment Claim

Balding-Margolis also appeals the district court's adverse grant of summary judgment on her hostile-work-environment claim. *See Thornton v. Fed. Express Corp., 530 F.3d 451, 455 (6th Cir. 2008)* (stating elements of the prima facie case). She has presented the following evidence to establish her prima facie case of hostile work environment based on sexual harassment: (1) Director of Security, Don Murtaugh, once invited Balding-Margolis to lie down in his room; (2) Murtaugh once told Balding-Margolis that she was attractive; (3) Murtaugh once hit Balding-Margolis on the buttocks and "untied [her] apron, which was tied in the back," Pl. Dep. at 116; (4) Schultz once commented that he had a large penis; (5) Schultz once told Balding-Margolis that he had sex with [**19] one of her customers, asked Balding-Margolis to provide a free meal to that customer, and then "put his hands . . . against the wall and dry humped it or did a pelvic thrust against it," stating "I did her, I did her," *id.* at 125; (6) Schultz had once asked a female line cook to do the "boobie dance," which involved putting the cook's "hands underneath her chest" and moving them "up and down" and shaking "her hips," *id.* at 128; (7) "Schultz repeatedly bragged to Balding-Margolis about the day that he had sexual intercourse with a fellow Hyatt server and Balding-Margolis's female co-worker at the Hyatt," Am. Compl. at 15, P 58; (8) "Schultz repeatedly talked to Balding-Margolis" about a sexual relationship he had with a former co-worker, how that co-worker was pregnant, how Schultz "needed to mail that pregnant woman a check so that the woman can pay for an abortion," and how he wanted Balding-Margolis to put Schultz's check in the mail. [8] *Id.*

> [8]    Balding-Margolis did not mention instances (7) or (8) in her deposition, and these allegations were not considered by the district court. They are, however, listed in her Amended Complaint, and because Balding-Margolis did not directly contradict [**20] these assertions in her deposition, we consider them for purposes of summary judgment.

Upon consideration of the foregoing evidence, we believe that Balding-Margolis's allegations are sufficient to raise a question of fact as to whether she experienced a hostile work environment. *See, e.g., Hawkins v. An-*

Case: 10-4494    Document: 006110927196    Filed: 04/13/2011    Page: 71

Page 6

352 Fed. Appx. 35, *; 2009 U.S. App. LEXIS 24604, **;
2009 FED App. 0732N (6th Cir.)

*heuser-Busch, Inc., 517 F.3d 321, 334 (6th Cir. 2008).* The most invasive conduct included physical touching on at least two occasions. *See id.; Williams v. Gen. Motors Corp., 187 F.3d 553, 563 (6th Cir. 1999)* (finding that conduct including a physical invasion could "at minimum . . . raise[] a question of fact for [*44] the jury"). And Balding-Margolis alleges that Schultz "repeatedly" talked or bragged to her about his sex life and that her harassment occurred daily. [9] *See Hawkins, 517 F.3d at 334.*

> 9   The district court concluded that Balding-Margolis's assertion in her affidavit that the harassment was continual, ongoing, or "daily" conflicted with Balding-Margolis's deposition testimony that she had "identified specific incidents and agreed that she had discussed everything of a sexual nature." Dist. Ct. Order at 21. In so concluding, the district court erred. Balding-Margolis's precise deposition [**21] testimony in response to Hyatt's open-ended question as to whether or not she had mentioned "all the facts" relevant to her claim was that she could not think of any thing else at the moment. Pl. Dep. at 319. Balding-Margolis did not testify that she had mentioned every single fact she was using to support her claim. Thus, there was no direct conflict between the deposition and the affidavit-- Balding-Margolis never specifically ruled out the possibility of other instances of sexual harassment. *See Briggs, 463 F.3d at 513* (finding fault with the reasoning that "failure to mention . . . a material piece of evidence when asked about [a specific instance generally] was akin to admitting at the deposition that such evidence did not exist"). Furthermore, Balding-Margolis included several statements indicating that her harassment was continual and ongoing in her complaint, and she provided specific examples of that conduct. Am. Compl. at 15 P 58. Hyatt's counsel had the benefit of the complaint at the deposition and yet failed to ask about those instances. As Balding-Margolis points out, she "is under no obligation to volunteer information" that the questioner has not fairly sought. Motion [**22] in Opp'n to Strike at 4-5 (Doc. 41); *see Briggs, 463 F.3d at 513.*

Despite raising a question of material fact as to whether The 1890 workplace constituted a hostile work environment, however, Balding-Margolis is unable to show that Hyatt is liable for the conduct. Hyatt is liable for Schultz's actions unless Hyatt can show by a preponderance of the evidence that "it exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and that Balding-Margolis "unreasonably

failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Thornton, 530 F.3d at 456.* "Generally, an employer satisfies the first part of this two-part standard when it has promulgated and enforced a sexual harassment policy." *Id.* (citing *Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998),* and *Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)).* The record establishes that Hyatt had an effective sexual-harassment reporting policy. *See id.* The record further shows that Balding-Margolis's failure to take advantage of Hyatt's corrective policy was unreasonable. Although her post-deposition affidavit states that she [**23] complained to Hyatt management verbally over thirty times, Balding-Margolis's deposition testimony indicates that she never complained to anyone concerning Schultz's harassment and discriminatory conduct other than to Schultz himself. Her deposition testimony further establishes that she never complained to anyone about Murtaugh's conduct. Balding-Margolis failed to make these complaints notwithstanding that she testified that she was aware of the open-door policy, the complaint procedure, and the fact that if her immediate supervisor failed to act on her complaint she could go elsewhere. Balding-Margolis clearly took advantage of the complaint process with regard to a variety of run-of-the-mill matters, *infra* Part E, but she failed to take advantage of the policies when it mattered most. Thus, Balding-Margolis has failed to present evidence showing a genuine issue of material fact as to whether Hyatt should be held liable for Schultz's actions.

### E. Retaliation

Balding-Margolis next claims that the district court erred in dismissing her [*45] retaliation claims under Title VII and *Ohio Revised Code § 4112.02.* [10] Balding-Margolis contends that she engaged in protected activity by reporting "no [**24] less than 30 incidents of sexual harassment to Hyatt managers," by "objecting to [her manager's] daily workplace practice of referring to her age and gender" by calling her "mom," and by complaining about "her hourly wage issues related to training and tips." Appellant Br. at 31-34. Balding-Margolis has again failed to establish a prima facie case for her cause of action, as she cannot establish that she engaged in protected activity. [11] *See Garner v. Cuyahoga County Juvenile Court, 554 F.3d 624, 639 (6th Cir. 2009)* (establishing elements of prima facie case). Although Balding-Margolis contends that she made over thirty complaints, she fails to provide a citation to record evidence that supports her claim other than her affidavit, yet the pre-affidavit deposition testimony is directly to the contrary. A thorough review of the record evidence does indicate that Balding-Margolis made several complaints to Hyatt

management concerning general work-related issues, including a letter to the General Manager, but there is nothing in these complaints indicating that Balding-Margolis was objecting to discriminatory conduct against her based on her membership in a protected class. It appears [**25] that Balding-Margolis was simply unhappy with the manner in which Hyatt conducted business. As a panel of this court has noted,

> a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice. An employee may not invoke the protections of the Act by making a vague charge of discrimination. Otherwise, every adverse employment decision by an employer would be subject to challenge under either state or federal civil rights legislation simply by an employee inserting a charge of discrimination.

*Fox v. Eagle Distrib. Co., 510 F.3d 587, 591-92 (6th Cir. 2007)* (quotation omitted). Moreover, Balding-Margolis admitted in her deposition that she never spoke with Hyatt management about being subjected to sexual or age-based harassment or that she did not recall doing so. Her affidavit is insufficient to overcome the deposition testimony to the extent that she now claims that she did report harassment to Hyatt management. The district court did not err in granting summary judgment on the retaliation claims.

> 10  "Federal law provides the applicable analysis for reviewing retaliation claims" in Ohio. *Baker v. Buschman Co., 127 Ohio App. 3d 561, 713 N.E.2d 487, 491 (Ohio Ct. App. 1998)* [**26] (quotation omitted).
> 11  Even assuming Balding-Margolis can establish a prima facie case of retaliation, we conclude that she is unable to establish that Hyatt's reason for her termination was pretextual. *See White v. Baxter Healthcare Corp., 533 F.3d 381, 392-93 (6th Cir. 2008)* (discussing ways to establish pretext). There is ample evidence in the record to show that Balding-Margolis did, indeed, misappropriate funds and violate the cash-handling procedures in a number of ways and that this was the actual and sufficient reason to explain her termination.

**F. Intentional Infliction of Emotional Distress**

Balding-Margolis's claim of intentional infliction of emotional distress also fails. *See Miller v. Premier Indus.*

*Corp., 136 Ohio App. 3d 662, 737 N.E.2d 594, 603 (Ohio Ct. App. 2000)* (setting forth elements). Balding-Margolis has presented no evidence that she suffered "serious" emotional distress sufficient to raise a question of material fact under Ohio law. *See Paugh v. Hanks, 6 Ohio St. 3d 72, 6 Ohio B. 114, 451 N.E.2d 759, 765 (Ohio 1983)*. Furthermore, Balding-Margolis [*46] points to no actions by Hyatt that "constitute the sort of extremely atrocious and outrageous behavior that is 'utterly intolerable in a civilized community.'" *Talley v. Family Dollar Stores of Ohio, Inc., 542 F.3d 1099, 1111 (6th Cir. 2008)* [**27] (quoting *Ekunsumi v. Cincinnati Restoration, Inc., 120 Ohio App. 3d 557, 698 N.E.2d 503, 506 (Ohio Ct. App. 1997))*. Essentially, she argues that Hyatt's failure to act on her complaints as well as her ultimate termination constituted extreme and outrageous conduct. The record indicates, however, that Balding-Margolis did not, in fact, make the "sheer volume" of complaints that she claims, Appellant Br. at 43 n.28, and this court has concluded that "'an employee's termination, even if based upon discrimination, does not rise to the level of 'extreme and outrageous conduct' without proof of something more.'" *Talley, 542 F.3d at 1111* (quoting *Godfredson v. Hess & Clark, Inc., 173 F.3d 365, 376 (6th Cir. 1999)* (applying Ohio law)).

**G. Negligent Hiring**

Balding-Margolis also appeals the district court's grant of summary judgment with respect to her negligent-hiring claim. *See Peterson v. Buckeye Steel Castings, 133 Ohio App. 3d 715, 729 N.E.2d 813, 823 (Ohio Ct. App. 1999)* (setting forth elements). Balding-Margolis contends that Hyatt knew, or should have known, about the alleged unlawful conduct of its employees, but she presents no evidence other than her post-deposition affidavit to show that she complained to Hyatt or that Hyatt [**28] should have known via other avenues. The portions of her affidavit where Balding-Margolis claims to have reported the conduct directly conflict with Balding-Margolis's deposition testimony and must be disregarded. In light of her failure to show that Hyatt knew or should have known about its managers' actions, as required by Ohio law, we conclude that Balding-Margolis cannot establish a prima facie case of negligent hiring.

**H. Public-Policy Wrongful Discharge**

The Ohio Supreme Court has held "that an exception to the employment-at-will doctrine is justified where an employer has discharged his employee in contravention of a 'sufficiently clear public policy.'" *Painter v. Graley, 70 Ohio St. 3d 377, 1994 Ohio 334, 639 N.E.2d 51, 56 (Ohio 1994)*. In addition to identifying a clear public policy, *see id.*, to establish a prima facie case, Balding-

352 Fed. Appx. 35, *; 2009 U.S. App. LEXIS 24604, **;
2009 FED App. 0732N (6th Cir.)

Margolis must show that her dismissal would jeopardize that public policy. *See id. at 57 n.8.* Balding-Margolis has failed to do so. Ohio law is clear that the statutory remedies under state and federal anti-discrimination law sufficiently protect an individual against unlawful discrimination and retaliation such that a public-policy tort is unavailable in such cases. *See, e.g., Wiles v. Medina Auto Parts, 96 Ohio St. 3d 240, 2002 Ohio 3994, 773 N.E.2d 526, 531 (Ohio 2002).* [**29] Balding-Margolis's second argument related to her public-policy tort is frivolous. Balding-Margolis alleges that Schultz questioned her about a conversation with her current attorney and that her termination was close enough in time to Schultz's inquiry to raise a question regarding the connection between the two. Balding-Margolis concedes, however, that when she spoke with her present attorney he was not her attorney; rather, he was simply a customer at the restaurant. Absent an attorney-client relationship, even if Balding-Margolis could show her termination was related to the conversation, Balding-Margolis fails invoke a public policy sufficient for wrongful discharge.

## III. CONCLUSION

After thorough consideration of each of Balding-Margolis's claims, we **AFFIRM** [*47] the district court's judgment for all of the reasons discussed above.



LEXSEE 1998 US APP LEXIS 31986

**SANDRA BARNA, Plaintiff-Appellee, v. CITY OF CLEVELAND, Defendant-Appellant.**

**Nos. 96-3971, 96-4178 & 97-4130**

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

*1998 U.S. App. LEXIS 31986*

**December 22, 1998, Filed**

**NOTICE:**    [*1]  NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 206 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 206 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:**    Reported in Table Case Format at: *1998 U.S. App. LEXIS 38134.*

**PRIOR HISTORY:**    ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO. 95-01324. Nugent. 8-2-96, 9-23-96, 9-4-97.

**DISPOSITION:**   District Court's judgment affirmed in part and case remanded.

**COUNSEL:** For SANDRA BARNA, Plaintiff - Appellee (96-3971, 96-4178): Alan S. Belkin, Cleveland, OH.

For CITY OF CLEVELAND, Defendant - Appellant (96-3971, 96-4178): Verna Jo A. Lanham, Charles E. Hannan, Jr., City of Cleveland Law Department, Office of Director of Law, Cleveland, OH.

For MICHAEL HAHN, MARIE HAHN, Plaintiffs - Appellants (96-4130): Douglas R. Jennings, Philip M. Collins & Associates, Columbus, OH.

MICHAEL HAHN, Plaintiff - Appellant (96-4130), Pro se, Columbus, OH.

MARIE HAHN, Plaintiff - Appellant (96-4130), Pro se, Columbus, [*2] OH.

For DOMTAR GYPSUM, Defendant - Appellee (96-4130): William B. Leahy, Michael J. Holleran, Thompson, Hine & Flory, Cleveland, OH.

**JUDGES:** Before: MERRITT, SILER AND GILMAN, Circuit Judges.

**OPINION BY:** MERRITT

**OPINION**

   **MERRITT, Circuit Judge.** This is a hostile work environment claim by the plaintiff Sandra Barna against the defendant City of Cleveland, Ohio pursuant to Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.* A jury found that the plaintiff's supervisor sexually harassed her while the plaintiff worked for the defendant as a commercial painter during a seventeen day span in 1993. The jury also found that the defendant was liable for failing to respond adequately to the plaintiff's complaint. The defendant now appeals the District Court's denial of its motions for a directed verdict and new trial. The defendant also appeals the jury award of $ 125,000 to the plaintiff and the District Court's award of reasonable attorney fees. We uphold the District Court's judgment, subject to a remittitur of $ 75,000. We also uphold the District Court's award of attorney fees.

**I. FACTS**

The plaintiff worked for the defendant for a total [*3] of two years as a commercial painter. The plaintiff began working for the defendant in 1992 at Cleveland's Hopkins International Airport. In October 1993, the plaintiff's union referred her to a different painting job with the defendant at Cleveland's Fairfax Recreation Center. Shortly after the referral, the plaintiff's new supervisor, Darrell Thornton, contacted the plaintiff to talk about her potential starting date and other business matters. Thornton and the plaintiff had previously worked together for a few days in 1984 as painters for the Cleveland Board of Education. At the Board, Thornton and the plaintiff were simply co-workers, though the parties both agree that Thornton acted as the plaintiff's supervisor at the Recreation Center in 1993.

During the trial in this action, the plaintiff testified that her 1984 experience with Thornton was unpleasant because Thornton bullied and ridiculed her. Thornton assured the plaintiff in October 1993 that he would be far more pleasant to work with than he was in 1984. The plaintiff believed that Thornton was sincere and agreed to work for him. The plaintiff began working with Thornton on November 15, 1993, and Thornton began sexually [*4] harassing her almost immediately thereafter. The plaintiff testified that the harassment occurred on a daily basis, involving sexual propositions, characterizations and gestures. Specifically, the plaintiff testified at trial that:

    1) Thornton at one time grabbed her when she was climbing down from a ladder. The plaintiff alleges she was "squeezed so hard" by Thornton that her breasts were "crushed." Through it all, Thornton whispered to the plaintiff: "We're friends, aren't we honey. I could take care of you,"

    2) Thornton once asked the plaintiff point blank to "suck his dick." Thornton intimated that things would be "bad" for the plaintiff if she refused, and if she agreed, Thornton promised to treat her "like a queen,"

    3) Thornton often bragged about his sexual prowess to the plaintiff, including promises of particular skill and experience in pleasuring women. Thornton specifically told the plaintiff that she did not "know what it's like unless [she had] a black man." Thornton was black, and the plaintiff was white,

    4) Thornton often made carnal characterizations of the plaintiff's body,

    5) Thornton often made lewd gestures with his own body to the [*5] plaintiff and

    6) Thornton was generally abusive toward the plaintiff, calling her a "trouble maker" and a "white bitch."

On December 9, 1993, the plaintiff left her job without explanation or advance notice to anyone at the Recreation Center. The plaintiff also left her job before notifying the defendant about Thornton's alleged behavior. Immediately after leaving her job, the plaintiff attempted to contact Thornton's superior, Cleveland's Commissioner of Recreation, to inform him of Thornton's conduct. The plaintiff never connected with the Commissioner. Subsequently, the plaintiff contacted her union and made a complaint against Thornton. The union forwarded her complaint to the defendant's office of Equal Employment Opportunity (the "EEO").

At the EEO, manager Miquel Torres received the plaintiff's complaint in approximately the second week of December. Torres typically dealt with complaints at the EEO first by determining whether the complainant was in any continuing danger. If not, Torres then gathered information regarding the complaint, including witness interviews or statements. Once information was collected, Torres would offer the alleged perpetrator an opportunity [*6] to offer explanations or statements at a pre-disciplinary hearing. Finally, after completing all the fact-finding, Torres would issue a report presenting his factual findings and remedial recommendations.

In the plaintiff's case, Torres reviewed the plaintiff's written report and spoke to her by phone on "many occasions" during the investigation. Torres attempted to obtain as many details as possible about the harassment, though the plaintiff did not inform Torres of all the details of Thornton's conduct to which she would later testify at trial. Most notably, the plaintiff failed to inform Torres that Thornton had asked the plaintiff to engage in oral sex with him or that Thornton stated that the plaintiff never had a "good man" until she "had a black man." Torres also interviewed several witnesses from the Recreation Center. Torres alleged that none of these witnesses corroborated the plaintiff's story, including Joyce Grayson, the only other female painter at the Center. Grayson testified, however, that she informed Torres that Thornton had made "sexual overtures" toward the plaintiff and was generally "rude" toward her.

On December 23, 1993, Torres conducted a pre-disciplinary [*7] hearing with Thornton. Thornton denied the plaintiff's allegations and provided his own written statement along with statements from witnesses cor-

roborating his claim that he never made any improper sexual comments or engaged in lewd behavior toward the plaintiff. During this hearing, Torres received no evidence corroborating the plaintiff's claim, though Torres did hear testimony that Thornton could often times be a very demanding, if not brusque, boss. At the conclusion of the hearing, Torres informed Thornton of the defendant's sexual harassment policies and gave him informational literature. On December 30, 1993, Torres concluded his investigation by issuing a report indicating that he could not confirm or deny the plaintiff's allegations against Thornton. Torres also noted that Thornton had no past disciplinary record. Torres thus recommended that no disciplinary action be taken against Thornton, aside from his prior discussion with Thornton regarding the defendant's sexual harassment policy.

The plaintiff later filed sexual harassment charges with the United States Equal Employment Opportunity Commission (the "EEOC") on March 25, 1994. On May 4, 1995, the EEOC issued the plaintiff [*8] a Notice of Right to Sue. The plaintiff filed this lawsuit in District Court on June 14, 1995. The plaintiff alleged federal and state law claims of hostile environment and quid pro quo sexual harassment and retaliation. At trial, Grayson testified for the plaintiff and offered corroborating evidence of Thornton's conduct that was far more detailed than Grayson's description to Torres earlier. Other trial witnesses offered testimony consistent with their prior statements to Torres. The plaintiff testified that as a result of Thornton's harassment, she lost fifteen pounds, suffered trembling in her hand, broke out into hives and experienced nausea and trouble sleeping during the three weeks she was at the Recreation Center. She also testified that she was emotionally distressed and severely humiliated by Thornton's conduct. The plaintiff did not, however, seek medical treatment at the time. Furthermore, the plaintiff did not testify that she suffered from any continuing symptoms.

The defendant moved for a motion for judgment as a matter of law on the first day of the jury trial. At the close of the defendant's case, the District Court dismissed the plaintiff's state law claims, quid [*9] pro quo sexual harassment claim and retaliation claim. The District Court did not, however, dismiss the plaintiff's federal hostile environment sexual harassment claim. The District Court also denied the defendant's motion for a judgment as a matter of law. In its jury instructions, the District Court stated that the plaintiff would prevail only if she had proved by a preponderance of the evidence that she suffered from a hostile environment and that the defendant had failed to take adequate and effective corrective action. On June 27, 1996, the jury delivered a verdict for the plaintiff in the amount of $ 125,000. The plaintiff later filed a Motion for Award of Reasonable Attorney Fees. The District Court subsequently granted attorney fees in the amount of $ 15,640.

## II. ANALYSIS

The Court must first consider whether the District Court acted properly in denying the defendant's motions for a new trial and judgment as a matter of law. The District Court's judgment may be overturned only if it is against the clear weight of the evidence. *See Bruner v. Dunaway, 684 F.2d 422, 425 (6th Cir. 1982).* Our focus is on the jury's verdict that the plaintiff suffered from [*10] a hostile environment for which the defendant is liable. In *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993),* the Supreme Court held that both objective and subjective standards must be applied when determining whether conduct constitutes a hostile environment in violation of Title VII. Conduct must be so severe and pervasive that both a reasonable person and the actual victim find it abusive. *See id.* In making this determination, courts should consider several factors, including the frequency of the alleged conduct, its severity, its verbal or physical nature and whether it unreasonably interfered with an employee's work performance. *See id. at 23.*

Applying the law to the facts, there is abundant evidence to support the jury's verdict. Thornton harassed the plaintiff on a daily basis, subjecting her to a constant stream of sexual comments, requests, advances, characterizations and gestures. Moreover, the plaintiff testified that Thornton grabbed her and squeezed her on one occasion and directly asked her on another occasion for oral sex. Both these incidents alone might be enough to support a finding [*11] of a hostile environment, even apart from Thornton's other comments and actions that might have been less "severe" but certainly very "frequent," i.e., daily for seventeen days. Finally, the plaintiff provided evidence that Thornton's conduct unreasonably interfered with her work at the Recreation Center and caused her distress. Thornton's behavior was thus both objectively and subjectively abusive toward the plaintiff.

The evidence also supports the jury's verdict that the defendant is liable for Thornton's misconduct under the new standard for employer liability recently enunciated by the Supreme Court. The Court ruled that employers are now vicariously liable for hostile environments created by their supervising employees rather than liable only for their own negligence. *See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 141 L. Ed. 2d 633, 118 S. Ct. 2257, 2270 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 141 L. Ed. 2d 662, 118 S. Ct. 2275, 2292-93 (1998).* The Court also provided an affirmative defense to vicarious liability to employers who demonstrate through a preponderance of the evidence that (1) they used reasonable care [*12] in seeking to correct and

prevent sexual harassment and (2) the aggrieved employee unreasonably failed to take advantage of her employer's efforts. *See Ellerth, 118 S. Ct. at 2270; Faragher, 118 S. Ct. at 2293.* Though this case was decided based on the negligence rules governing employer liability prior to *Ellerth/Faragher*, we can still decide whether it is reasonable to find the defendant liable under current law based on the record before us. The District Court charged the jury to consider one of the issues that is central to the *Ellerth/Faragher* affirmative defense to vicarious liability, i.e., whether the defendant acted adequately and effectively in responding to the plaintiff's complaint. The jury found that the defendant did not, and we agree in light of the defendant's failure to discipline Thornton for his threatening behavior toward the plaintiff.

An employer's response to a report of sexual harassment must be proportionate to the severity of the alleged misconduct. *See Kauffman v. Allied Signal, Inc., 970 F.2d 178, 184 (6th Cir. 1992)* (holding that an employer's response must be adequate to negate liability). [*13] Though an employer's response must be swift and certain, disciplinary action is not required in every case, particularly when an employer undertakes an adequate investigation but fails to substantiate an employee's allegations. In this case, the defendant found that the plaintiff's complaint was inconclusive and thus responded simply by informing Thornton of its sexual harassment policy. We find that this response was inadequate because the record, when viewed in the light most favorable to the plaintiff, shows that Torres was able to corroborate that Thornton had made some sexually suggestive comments to the plaintiff at work. At trial, Grayson testified that she told Torres that Thornton had made "sexual overtures" to the plaintiff. Even though Torres disputed Grayson's testimony, the jury was still free to conclude that Grayson was telling the truth. Based on Grayson's comments to Torres, some disciplinary action was in order.

The defendant also argues that it had no duty to respond to the plaintiff's complaint because the plaintiff left the workplace before notifying the defendant of her troubles with Thornton. The defendant's notion of proper employer notice is far too broad. [*14] Under the pre-Ellerth/Faragher negligence rules, the courts held that an employer may be liable for workplace harassment so long as it was aware of the harassment before an employee sued but not necessarily before an employee left the workplace. *See Davis v. McNea, 1997 U.S. App. LEXIS 5413*, No. 96-5272, 1997 WL 123745, at *4 (6th Cir. Mar. 18, 1997). The plaintiff in this case notified the defendant of Thornton's behavior months before filing suit, thereby giving the defendant ample time to remedy the plaintiff's complaint before liability was imposed.

Under the new *Ellerth/Faragher* vicarious liability rule, the analysis is no different. An employer is now essentially strictly liable for workplace harassment by supervisors unless it can establish the affirmative defense. An employer does not establish this defense simply by showing that an employee left the workplace before reporting her allegations. Fairness requires only that an employer be given an opportunity to respond to an employee's complaint before being pulled into court.

The defendant also appeals the jury award of $ 125,000 for compensatory damages. We find that the jury award is excessive. [*15] The plaintiff presented no evidence that she continued to suffer from any of her emotional or physical problems after she left work with Thornton. At trial, the plaintiff only testified that she was still "bothered" by Thornton's 1993 conduct and that she was "embarrassed" to be on the witness stand. Without persuasive proof that the plaintiff suffered from serious and long lasting symptoms, an award of $ 125,000 is disproportionate to the harm actually suffered by the plaintiff during her three weeks of employment at the Recreation Center. The Court has the power to order a remittitur with the consent of the prevailing party. *See Coal Resources, Inc. v. Gulf & W. Indus., Inc., 954 F.2d 1263, 1269 (6th Cir. 1992)*. The Court orders the jury award remitted by $ 75,000. The resulting $ 50,000 award is more consistent with jury awards in other harassment and discrimination cases. *See, e.g., Feltner v. The Title Search Co., 1998 U.S. App. LEXIS 21691*, Nos. 97-1087, 97-3413, 1998 WL 636773 (7th Cir. Sept. 2, 1998) (affirming award of $ 20,000 in compensatory damages for "persistent and invasive sexual harassment" over a twenty-one month period); [*16] *Thompson v. Thompson, 935 F.2d 271 (6th Cir. 1991)* (upholding jury award of $ 55,000 in compensatory damages for quid pro quo sexual harassment over an unspecified period of time). If the plaintiff does not consent to a remittitur of $ 75,000, the District Court will conduct a new trial.

Finally, the defendant appeals the District Court's award of $ 15,640 in attorney fees to the plaintiff. We review the District Court's award for abuse of discretion. *See Wayne v. Village of Sebring, 36 F.3d 517, 531-32 (6th Cir. 1994)*. A party must make a motion for attorney fees "no later than 14 days after entry of judgment." *Fed. R. Civ. P. 54(d)(2)(B)*. A district court, however, may extend this time even after it has expired if a party shows that its failure to act before was a result of "excusable neglect." *Fed. R. Civ. P. 6(b)*. In this case, the plaintiff obviously filed her motion for attorney fees well after fourteen days from the District Court judgment. However, the plaintiff later submitted an affidavit explaining that the delay was attributable to a good faith effort at settling the case to avoid a future appeal by the defendant. As soon as the plaintiff [*17] learned that the de-

1998 U.S. App. LEXIS 31986, *

fendant was likely to appeal the District Court's judgment, the plaintiff made her motion for attorney fees. The plaintiff's delay in doing so is thus perfectly excusable. Moreover, we find that the District Court did not abuse its discretion in granting attorney fees for 22.5 hours billed as "general correspondence and phone calls" without further detail. A plaintiff's counsel "is not required to record in great detail how each minute of his time expended." *Hensley v. Eckerhart, 461 U.S. 424, 437 n.12, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983).* We agree with the District Court that the plaintiff has met her bur-

den of proving that she is entitled to compensation for the 22.5 hours. This is a reasonable amount of time for correspondence and phone calls in a case that otherwise totaled 75.25 hours in work for the plaintiff's counsel.

**III. CONCLUSION**

For the foregoing reasons, we affirm the District Court judgment in all respects, except we remand to the District Court to carry out our instructions respecting a remittitur of $ 75,000.



LEXSEE 298 FED APPX 436

**CHRISTINA HOWINGTON, Plaintiff-Appellant, v. QUALITY RESTAURANT CONCEPTS, LLC and TYLER KIRK, Defendants-Appellees.**

No. 08-5136

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

08a0636n.06; *298 Fed. Appx. 436*; *2008 U.S. App. LEXIS 22003*; *2008 FED App. 0636N (6th Cir.)*; *104 Fair Empl. Prac. Cas. (BNA) 1172*

**October 20, 2008, Filed**

**NOTICE:**    NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** [**1]
ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE.
*Howington v. Quality Rest. Concepts, LLC, 2008 U.S. Dist. LEXIS 390 (E.D. Tenn., Jan. 3, 2008)*

**COUNSEL:** For CHRISTINA HOWINGTON, Plaintiff - Appellant: Steven Ray Minor, R. Lucas Hobbs, Elliott, Lawson & Minor, Bristol, VA.

For QUALITY RESTAURANT CONCEPTS, LLC, TYLER KIRK, Defendants - Appellees: Steven H. Trent, Chad E. Wallace, Baker, Donelson, Bearman, Caldwell & Berkowitz, Johnson City, TN.

**JUDGES:** BEFORE: CLAY and KETHLEDGE, Circuit Judges; and OLIVER, District Judge. \*

> \*    The Honorable Solomon Oliver, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

**OPINION BY:** CLAY

**OPINION**

[*437]  **CLAY, Circuit Judge.** Plaintiff, Christina Howington, appeals the decision of the district court granting summary judgment to Defendants Quality Restaurant Concepts, LLC ("QRC") and Tyler Kirk with respect to Plaintiff's sexual harassment and retaliation claims under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.*, and the Tennessee Human Rights Act ("THRA"), *Tenn. Code Ann. § 4-21-101 et seq.* [1] For the reasons stated below, we **REVERSE** the decision of the district court and **REMAND** the case for trial.

> 1    Because the Tennessee legislature intended the THRA "to be coextensive with federal law," claims [**2] under the THRA follow the same analysis as those under Title VII. *Parker v. Warren County Util. Dist.*, *2 S.W.3d 170, 172 (Tenn. 1999)*.

**STATEMENT OF FACTS**

Plaintiff Christina Howington began working at an Applebee's restaurant owned by Defendant QRC in January of 2006. Defendant Tyler Kirk was a "key hourly manager" at the Applebee's where Plaintiff worked, a role that sometimes placed Kirk in a supervisory position over Plaintiff. According to Plaintiff, Kirk began sexually harassing her shortly after she started working with him.

Plaintiff stated that the first such incident occurred when she went to a local bar called "Wing Doctor" with

Case: 10-4494   Document: 006110927196   Filed: 04/13/2011   Page: 80

Page 2

298 Fed. Appx. 436, *; 2008 U.S. App. LEXIS 22003, **;
2008 FED App. 0636N (6th Cir.); 104 Fair Empl. Prac. Cas. (BNA) 1172

several of her co-workers, including Kirk. At one point during this outing, Kirk was playing a game that involved retrieving stuffed animals with a crane. After Plaintiff expressed interest in one of the stuffed animals, [*438] Kirk offered to win it for her if she would let him "eat the kitty," by which Kirk meant that he wanted to perform oral sex on Plaintiff. (J.A. 31.) Following this incident, Plaintiff avoided social interaction with Kirk.

Nevertheless, according to Plaintiff, Kirk continued to proposition her for sex. When they worked together, Kirk sometimes [**3] asked her to come over to his place to "have a few beers," or suggested that she come to his place to have sex. (J.A. 34.) When Plaintiff refused, Kirk asked her, "Why? Don't you have sex? Don't you enjoy having sex? What's wrong with sex?" (Id.) Plaintiff was not able to recall how many times Kirk propositioned her, but she says that it happened "every day that [she] worked with him." (J.A. 35.) Plaintiff also claims that Kirk became increasingly aggressive with her. At times, Plaintiff testified, Kirk "scream[ed]" at her in front of her co-workers and customers, and he twice slammed a door in her face. (J.A. 39, 190.) Moreover, Plaintiff stated that Kirk sent her a string of harassing text messages in which he told her that "if [she] didn't have sex with him[, she] wasn't going to be employed [at Applebee's] anymore." (J.A. 190.)

According to Plaintiff's deposition testimony, tensions between Plaintiff and Kirk escalated on March 7, 2006. On this date, Chrissy Williams, one of Plaintiff's co-workers who had previously dated Kirk, asked Plaintiff if she could listen to a voicemail message left on Plaintiff's phone. Because QRC's policy prohibited employees from using cell phones while [**4] they were working, Plaintiff sought Kirk's permission to allow Williams to use Plaintiff's cell phone. Kirk allegedly told Plaintiff that she and Williams could use the phone as long as they did so in the back of the restaurant. Despite giving Plaintiff and Williams permission to use the cell phone, Plaintiff testified that Kirk later went to the back of the restaurant, snatched the phone out of their hands, and ordered both women to go home. Before leaving the restaurant, Plaintiff spoke with J.B. Hill, a salaried manager who outranked Kirk. Although Plaintiff's testimony is vague regarding the contents of this conversation, [2] she stated that Hill told her to "let [Kirk] blow off his steam," and that she should still "[c]ome back tomorrow." (J.A. 46.)

2  Prior to a follow-up question from Defendants' attorney, Plaintiff described her conversation with Hill as follows: "And J.B. told me, because J.B. was there, not to worry about it, blah, blah, blah, blah, blah, just to come back tomorrow, we'll talk about it." (J.A. 44.)

The next day, March 8, 2006, Plaintiff returned to work. Hill called her into his office, and presented her with a "Written Warning of Violation." (J.A. 81.) According [**5] to this written warning, which both Hill and Kirk signed as Plaintiff's supervisors, Plaintiff engaged in "[u]nruly and disrespective [sic] behavior towards [a] manager on duty," and "displayed unprofessional actions . . . directly in front of customers." (Id.) Although Plaintiff signed the form containing the warning, she claims that, while she was meeting with Hill, she informed him that Kirk "had wanted to pursue a relationship and that [she] had told him no," and that, in response, Kirk had "been mean to [her] and cussed [her], [and] had been violent toward [her]." (J.A. 46.) According to Plaintiff, she also told Hill that this treatment was "really starting to affect [her] work" and that she did not want to work with Kirk anymore because she was afraid of him. (J.A. 46.) Plaintiff also testified that she showed Hill text messages [3] that she had [*439] received from Kirk in which Kirk had threatened to fire her in an attempt to make her have sex with him. Despite the evidence of sexual harassment which Plaintiff claims to have presented to Hill, Hill allegedly told Plaintiff that he would "try to . . . work on not having [Plaintiff and Kirk] scheduled together," and that she needed to [**6] "understand that [Kirk's] . . . a nice-looking guy." (J.A. 46.)

3  Because Plaintiff has not produced copies of the text messages, it is uncertain whether Kirk in fact sent text messages to Plaintiff. Plaintiff received only eleven text messages during her brief time working for QRC and, although Kirk does not explicitly deny sending the messages to Plaintiff, Kirk's affidavit states that none of the eleven text messages came from a number belonging to him.

On March 9, 2006, the day after Plaintiff's conversation with Hill, Plaintiff had two letters hand delivered to Applebee's. The first, addressed to Amber Leonard, the restaurant's General Manager, informed Leonard that Plaintiff "ha[s] been a victim of sexual harassment and verbal abuse" by Kirk, and described several of the incidents that occurred after Plaintiff informed Kirk that she "was not interested in a sexual relationship with him." (J.A. 83.) The letter further noted that Plaintiff did not believe Hill had handled her conflict with Kirk in an acceptable manner. The second letter, addressed to Kirk, stated that Plaintiff found his "actions [to] have been so aggressive that [she] do[es] not feel safe within [Kirk's] company," [**7] and asked Kirk to "abstain from all contact" with her. (J.A. 84.)

According to an affidavit from Danny Hodge, QRC's Regional Manager, Hodge learned about Plaintiff's letters

the same day that they were delivered to the restaurant, and he immediately launched an investigation into Plaintiff's allegations. The next day, Hodge visited the Applebee's where Plaintiff worked, reviewed the letters she had written, and interviewed Leonard, Hill, and Eric Bouchet, the restaurant's Assistant Manager. Hodge also made several attempts to speak with Plaintiff over the phone, but Plaintiff told him that "her schedule was busy and she could not talk with [him] then about her harassment complaints." (J.A. 86.) Although Plaintiff and Hodge exchanged several voicemails following this brief conversation, Hodge claims that Plaintiff eventually stopped returning his calls, and that they never discussed the substance of her allegations. Although Plaintiff does not contest most of Hodge's affidavit, she claims that Hodge did not speak with her until after her last day of work at Applebee's.

Plaintiff's employment at Applebee's ended on March 11, 2006, the day after Hodge's visit to the restaurant. On March [**8] 11, 2006, Plaintiff parked her car in a place where she could see it through the restaurant's front window because she was concerned that someone might vandalize her car or take her cell phone from her car. Plaintiff's actions, however, violated a QRC policy requiring "all crewmembers [to] park in the back of the building" "[u]nless scheduled to close the restaurant at night . . ." (J.A. 80.) Citing this policy, Kirk ordered Plaintiff to move her car behind the building. When Plaintiff informed Kirk that she did not feel comfortable moving her car to a place where she would be unable to see it from the restaurant, Kirk stated that, if she did not move it, she "could leave and not worry about ever coming back." (J.A. 55.) Plaintiff again refused to move her car, and Kirk told her to "leave" and that she was "done." (J.A. 55, 61.) Plaintiff believed that Kirk terminated her at the end of this exchange. As a result, she left the restaurant, returning only to drop off her uniform and pick up a paycheck.

Despite Kirk's instructions that Plaintiff should leave and never come back to the restaurant, QRC maintains that Kirk did not terminate Plaintiff and, further, that [*440] Kirk was not authorized [**9] to fire employees. Specifically, Hill claims that during his conversation with Plaintiff on March 8, 2006, he informed her that Kirk lacked such authority. Hodge's affidavit confirms that, within QRC's corporate hierarchy, a key hourly manager such as Kirk does not have the power to fire employees. Further, after Plaintiff refused to move her car, Kirk completed and signed a second written warning to Plaintiff, which states that she would receive a thirty-day cooling-off period, not termination.

After obtaining a right-to-sue letter from the EEOC, Plaintiff filed this case against Kirk and QRC on March 2, 2007, alleging sexual harassment and retaliation. On January 3, 2008, the district court granted summary judgment to Defendants with respect to each of Plaintiff's claims. This appeal followed.

## DISCUSSION

### I. Sexual Harassment Claims

#### Standard of Review

The district court granted summary judgment in favor of Defendants on Plaintiff's sexual harassment claims. We review a district court's grant of summary judgment de novo. Farhat v. Jopke, 370 F.3d 580, 587 (6th Cir. 2004). A grant of summary judgment is appropriate only when "the discovery and disclosure materials on file, and any affidavits [**10] show that there is no genuine issue as to any material fact" as to an essential element of the non-moving party's case. Fed. R. Civ. P. 56(c). An issue of fact is "genuine" if a reasonable person could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). After the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

#### Analysis

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). This prohibition encompasses two types of sexual harassment. [4] First, it forbids quid pro quo harassment, which occurs when an employee's submission to unwanted sexual advances becomes either a condition for the receipt of job benefits, or the means to avoid an adverse employment action. See Bowman v. Shawnee State Univ., 220 F.3d 456, 461 (6th Cir. 2000). Title VII also "affords [**11] employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult," and, to enforce this right, prohibits conduct that creates a "hostile environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986). Plaintiff claims that Kirk's conduct constituted quid pro quo harassment, and that Kirk's actions [*441] created a hostile work environment. For the reasons that follow, summary judgment was improper, and both claims should proceed to trial.

[4]   Whether sexual harassment culminates in an adverse employment action determines whether a

Case: 10-4494    Document: 006110927196    Filed: 04/13/2011    Page: 82

Page 4

298 Fed. Appx. 436, *; 2008 U.S. App. LEXIS 22003, **;
2008 FED App. 0636N (6th Cir.); 104 Fair Empl. Prac. Cas. (BNA) 1172

claim falls within the *quid pro quo* framework, or should be evaluated as a hostile environment claim. As the Supreme Court explained, "[w]hen a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." *Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753-54, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).* In contrast, "[f]or [**12] any sexual harassment preceding the employment decision to be actionable, . . . the conduct must be severe or pervasive." *Id. at 754.*

### A. *Quid Pro Quo*

When a sexual harassment plaintiff experiences a "tangible employment action," a plaintiff may prevail in a claim against the employer upon proof of the following:

> 1) that the employee was a member of a protected class; 2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; 3) that the harassment complained of was on the basis of sex; 4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in a tangible job detriment; and 5) the existence of respondeat superior liability.

*Id.* In this case, Plaintiff is part of a protected class because she is a woman, and Defendants do not contest that Kirk made unwelcomed advances. It is also uncontested that the harassment was based on Plaintiff's sex. Thus, whether the district court properly granted summary judgment to Defendants depends on whether a reasonable jury could find that [**13] Plaintiff has proven the final two elements of her claim. [5]

> 5    Defendant claims that Plaintiff has waived her *quid pro quo* sexual harassment claim by failing to raise it on appeal. This argument lacks merit, as Plaintiff expressly argues in her brief that "Mr. Kirk was acting formally in his capacity as a supervisor in sending Ms. Howington home, and writing her up as he did. It was the act of a supervisor bringing the official power of the enterprise

to bear on his subordinate, and therefore the employer should be strictly liable if the act was illegally motivated." Pl.'s Br. 11-12 (citations omitted).

### 1. *Respondeat Superior* Liability

To prevail on a *quid pro quo* claim, a plaintiff must demonstrate the existence of respondeat superior liability. *Id.* "Under the theory of respondeat superior, employers are held strictly liable for conduct of supervisory personnel who have plenary authority to hire, fire, promote, and discipline employees." *Kauffman v. Allied Signal, Inc., 970 F.2d 178, 186 (6th Cir. 1992).* Strict liability, however, is not limited to supervisors with such broad authority. Rather, "all that is required is that the employee have 'significant control' of those duties." *Id.*

In [**14] claiming that summary judgment was appropriate, Defendants emphasize that, as a very junior supervisor within QRC's corporate structure, Kirk lacked the power to hire and fire employees. The record suggests, however, that even if QRC's policy did not authorize Kirk to terminate employees, Kirk exercised "significant control" over personnel matters because of his apparent unilateral authority to discipline his subordinates. Defendants do not contest that, on two separate occasions, acting solely on his own authority, Kirk ordered Plaintiff to leave the restaurant. Further, after refusing to move her car, Plaintiff received a thirty-day suspension from her job, and the discipline form memorializing her suspension lists Kirk as the supervisor approving the disciplinary action. Thus, although Kirk might have lacked authority to fire Plaintiff, he imposed significant disciplinary measures of only slightly less severity than termination. We believe that such unilateral authority constitutes "significant control" over personnel matters, and is thus sufficient to render QRC vicariously liable for Kirk's actions. *See id.*

### [*442] 2. *Tangible Job Detriment Resulting From Refusal*

Plaintiff also must demonstrate [**15] that her "submission to [Kirk's] unwelcomed advances was an express or implied condition for receiving job benefits[,] or that [her] refusal to submit to [Kirk's] sexual demands resulted in a tangible job detriment." *Bowman, 220 F.3d at 461.* Thus, Plaintiff may prevail if she demonstrates that she experienced an adverse employment action, [6] and that this action occurred because of her refusal to have sex with Kirk.

> 6    Defendants contend Plaintiff cannot, after arguing in district court that she was terminated, assert that the suspension constituted the adverse employment action. This argument is without merit. Plaintiff's opposition to Defendants' motion

Case: 10-4494    Document: 006110927196    Filed: 04/13/2011    Page: 83

Page 5

298 Fed. Appx. 436, *; 2008 U.S. App. LEXIS 22003, **;
2008 FED App. 0636N (6th Cir.); 104 Fair Empl. Prac. Cas. (BNA) 1172

for summary judgment effectively informed Defendants and the district court that Plaintiff believed she experienced a tangible job detriment when Kirk told her to leave work, and that she believes he did so because of her refusal to have sex with him. Arguments raised in a district court filing offered in opposition to a motion for summary judgment are preserved for appeal. *See Vencor, Inc. v. Standard Life and Acc. Ins. Co., 317 F.3d 629, 642 n.11 (6th Cir. 2003); see also Swinney v. Gen. Motors Corp., 46 F.3d 512, 522 (6th Cir. 1995)* [**16] (noting that an issue presented to a district court is preserved for appeal as long as the issue was presented to the district court in a manner which "places the opposing party and the court on notice that a new issue is being raised"). Defendants further argue that, had they understood Plaintiff's filings in the district court to encompass a claim that she experienced a tangible work detriment other than firing, they would have conducted additional discovery and argued to the district court that Kirk had a legitimate, non-discriminatory reason for disciplining Plaintiff, thus entitling them to relief. *See* Defs.' Br. 21-22. This defense, however, is viable regardless of whether Plaintiff was terminated or merely suspended. *See Bowman, 220 F.3d at 461.*

**a. Tangible Job Detriment**

While *de minimis* employment actions and "very temporary" actions are not materially adverse and, thus, not actionable under Title VII, *Bowman, 220 F.3d at 462,* those involving changes such as a termination or a suspension constitute adverse employment actions. *Arendale v. City of Memphis, 519 F.3d 587, 603 (6th Cir. 2008).* We have also recognized that a "loss of pay or benefits" can constitute a tangible job detriment. [**17] *See Thornton v. Fed. Express Corp., 530 F.3d 451, 454-55 (6th Cir. 2008).* The record in this case is unclear as to whether Plaintiff lost any of her hourly wages when Kirk sent her home from work in either instance. Plaintiff, however, also earned wages through tips as a day-shift bartender. As a result, Plaintiff undoubtedly lost compensation in the form of unearned tips for the days she was not at work after Kirk sent her home. Accordingly, a reasonable jury could find that Plaintiff has satisfied this element of her *prima facie* case.

**b. Causal Relationship**

The only remaining question is whether a reasonable jury could find that Plaintiff was disciplined because of her refusal to have sex with Kirk. *See Bowman, 220 F.3d at 461.* According to Plaintiff's deposition, Kirk propositioned her for sex "every day that [she] worked with him," (J.A. 35) he became increasingly aggressive with

her as she continued to refuse his advances, and he sent her text messages stating that "if [she] didn't have sex with him [she] wasn't going to be employed there anymore." (J.A. 190.) These facts are sufficient to allow a reasonable jury to infer that Kirk disciplined Plaintiff because of her refusal to [**18] have sex with him. *Cf. Idusuyi v. State of Tenn. Dep't of Children's Servs., 30 F. App'x 398, 401 (6th Cir. 2002)* (finding no causal relationship between refusal of sexual advances [*443] and the adverse employment action when alleged harasser did not participate in making the adverse decision).

In addition, Defendants present no evidence to rebut Plaintiff's claim that Kirk repeatedly propositioned her for sex. Defendants, however, contest Plaintiff's claim that Kirk sent her text messages threatening to have her fired if she did not have sex with him. After Plaintiff introduced a copy of her cell phone records into evidence, Kirk stated in an affidavit that "[n]one of the numbers listed in [Plaintiff's phone records] ever belonged to me." Kirk's affidavit, however, is only two paragraphs long, and does not at any point deny that he sent threatening text messages to Plaintiff, but denies only that he sent text messages to her from his own phone number. Thus, it remains unclear whether Plaintiff received text messages from Kirk, presenting a genuine issue of material fact relevant to determining whether a causal relationship existed between the adverse employment action and Plaintiff's refusals. [**19] As a result, we conclude that the district court improperly granted summary judgment to Defendants with respect to Plaintiff's *quid pro quo* claim. [7]

> 7  Defendants also claim that *Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)* and *Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)* entitle them to an affirmative defense against Plaintiff's sexual harassment claim because QRC "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and Plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth, 524 U.S. at 765.* This affirmative defense, however, is not available "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Id.* Because Kirk's alleged harassment of Plaintiff culminated in his suspension of Plaintiff from work, Defendants may not assert the *Ellerth/Faragher* affirmative defense.

**B. Hostile Work Environment**

Case: 10-4494   Document: 006110927196   Filed: 04/13/2011   Page: 84

Page 6

298 Fed. Appx. 436, *; 2008 U.S. App. LEXIS 22003, **;
2008 FED App. 0636N (6th Cir.); 104 Fair Empl. Prac. Cas. (BNA) 1172

Plaintiff claims that Kirk's conduct throughout the course of her employment created a hostile environment. To prevail on her claim, Plaintiff must first establish a *prima* [**20] *facie* case. *See Clark v. UPS, 400 F.3d 341, 347 (6th Cir. 2005).* Specifically, Plaintiff must show that: "(1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment created a hostile work environment; and that (5) the employer is vicariously liable." *Id.* (formatting altered).

"For any sexual harassment preceding [an] employment decision to be actionable, . . . the conduct must be severe or pervasive." *Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 754, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).* Except in cases of truly egregious conduct, a workplace does not become a hostile work environment on the basis of isolated incidents of harassment. Rather, Plaintiff must show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).*

In addition, "[b]oth an objective and a subjective test must be met: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or [**21] abusive and the victim must subjectively regard that environment as abusive." *Bowman, 220 F.3d at 463.* This is not a "mathematically precise test," and, thus, the question of whether a particular work environment [*444] was tainted by severe or pervasive harassment will necessarily depend on the facts of a particular case. *Harris, 510 U.S. at 22.* Factors to consider in evaluating a hostile environment claim include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id. at 23.* This Court considers "the totality of the circumstances in determining whether the harassment was sufficiently severe or pervasive." *Randolph v. Ohio Dep't of Youth Servs., 453 F.3d 724, 733 (6th Cir. 2006).*

Plaintiff alleges that Kirk's conduct created a hostile work environment. Throughout her employment, Kirk asked Plaintiff to have sex with him "[p]retty much[] every day that [she] worked with him." (J.A. 35.) Second, during an after-work outing, Kirk asked to perform oral sex on her, and he did so by using a vulgar term for Plaintiff's genitals. [**22] Kirk also became increasingly angry with Plaintiff, and would sometimes yell at her in front of customers or slam a door in her face. [8] Finally, Kirk sent multiple text messages to Plaintiff threatening to have her fired if she did not have sex with him, and disciplined Plaintiff on two separate occasions.

8   Although there is nothing inherently sexual about yelling or slamming doors, this Court has held that non-sexual behavior may comprise part of a sexual harassment claim when that behavior "could well be viewed as work-sabotaging behavior that creates a hostile work environment." *Williams v. Gen. Motors Corp., 187 F.3d 553, 564 (6th Cir. 1999).* Thus, to the extent that Kirk's angry outbursts were an attempt to sabotage Plaintiff because she refused to have sex with him, they may be considered in determining whether Plaintiff experienced a hostile work environment.

In *Clark v. United Parcel Service, Inc.,* two UPS employees, Sandra Clark and Rhonda Knoop, brought hostile work environment claims against their employer, both claiming that Eli Brock, a supervisor, harassed them. *400 F.3d 341, 344 (6th Cir. 2005).* Knoop alleged that, over a period of two-and-a-half years, Brock routinely [**23] told sexual jokes in front of her, twice placed his vibrating pager against her upper thigh and asked if it "felt good," and once grabbed the back of her overalls and tried to look down them. *Id. at 344-345.* Nevertheless, the court found that, other than Brock's sexually inappropriate jokes, Knoop had experienced only three incidents of harassment in over two years, and that such "isolated incidents" did not rise to the level of creating a hostile work environment. *Id. at 352.* Moreover, the Court held that Brock's jokes were "not enough to elevate the isolated incidents to an ongoing and pervasive hostile environment." *Id.*

Although the court held that Knoop's allegations were insufficient to sustain a hostile environment claim, it reached the opposite result with respect to Clark. As with Knoop, Brock used his vibrating pager to harass Clark by tossing it in between her legs when she was sitting and asking her if it "fe[lt] good." *Id. at 345.* Clark, however, also described sixteen other incidents involving Brock, including a time when Brock placed a bag of potato chips on his crotch and encouraged Clark to reach her hand into the bag, and a time when he physically restrained Clark and [**24] scratched his finger against her palm. *Id.* Although the court believed that Clark's allegations were "similar in kind to Knoop's," the court held that they were sufficient to survive a motion for summary judgment because Clark presented "more of an ongoing pattern of unwanted conduct and attention by Brock." *Id. at 352.*

The court in *Clark* also cited *Stacy v. Shoney's, Inc., No. 97-5393, 1998 U.S. App. LEXIS 6659, 1998 WL* [*445] *165139 (6th Cir. Mar. 31, 1998)* to support its conclusion. In *Stacy,* a waitress's supervisor began "harassing her with sexually suggestive comments and leer-

Case: 10-4494    Document: 006110927196    Filed: 04/13/2011    Page: 85

Page 7

298 Fed. Appx. 436, *; 2008 U.S. App. LEXIS 22003, **;
2008 FED App. 0636N (6th Cir.); 104 Fair Empl. Prac. Cas. (BNA) 1172

ing looks." *1998 U.S. App. LEXIS 6659, [WL] at *1.*
When they did not work the same shift, the supervisor
would call her at home and say that he "missed her," and
when they did work together, he would comment, for
example, that her "tan sure does look good" and that he
"wish[ed] [he] could see more of it." *Id.* The supervisor
also told her that "if [he] had someone that looked like
[her], [he]'d not let them leave the house." *Id.* The wait-
ress also reported an incident when the supervisor inap-
propriately touched her breast. *Id.* Despite the supervi-
sor's statements and actions, the court held that the su-
pervisor's conduct was not "sufficiently frequent, severe,
physically [**25] threatening, or humiliating to unrea-
sonably interfere with [the] [p]laintiff's work perform-
ance to constitute actionable work place harassment."
*1998 U.S. App. LEXIS 6659, [WL] at *3.* As a result, the
court found the plaintiff's hostile environment allegations
insufficient to survive summary judgment. *Id.*

In this case, Plaintiff has alleged harassment that oc-
curred on an "ongoing" basis, similar to the pattern of
unwanted conduct this Court found sufficient to survive
summary judgment in *Clark. Clark, 400 F.3d at 352.*
Kirk's harassing behavior, in asking her to have sex with
him, occurred every day that Plaintiff worked with him,
and he frequently yelled at her while she was working.
He also sent her, on more than one occasion, text mes-
sages threatening to fire her if she did not submit to his
advances. Thus, Kirk's behavior was continuous and
"commonplace" in the work environment. *See Abeita v.
TransAm. Mailings, Inc., 159 F.3d 246, 252 (6th Cir.
1998).* Although Plaintiff is unable to describe more than
a few specific incidents of harassment, when a plaintiff
claims ongoing harassment, the "inability to recount any
more specific instances goes to the weight of her testi-
mony, a matter for the finder of fact[]." [**26] *Id.* While
each of the incidents Plaintiff describes, viewed sepa-
rately, would not be sufficient to demonstrate Kirk cre-
ated a hostile work environment, a reasonable person
could find that all of Kirk's actions, taken together, were
sufficiently severe or pervasive. *See Williams v. Gen.
Motors Corp., 187 F.3d 553, 562 (6th Cir. 1999).* We
conclude that Plaintiff has presented an issue for the fact
finder as to whether Kirk's actions were sufficiently se-
vere or pervasive. As a result, summary judgment was
inappropriate.

## II. Retaliation

### Standard of Review

The district court granted summary judgment with
respect to Plaintiff's retaliation claim. A district court's
grant of summary judgment is reviewed *de novo. Farhat,
370 F.3d at 587.*

### Analysis

In addition to prohibiting employment discrimina-
tion on the basis of sex, Title VII, in a separate provision,
also forbids employers from retaliating against an em-
ployee because the employee either opposed any practice
Title VII makes unlawful, or filed a charge under Title
VII. *Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S.
53, 56, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)* (citing
*42 U.S.C. § 2000e-3(a)*). To establish a *prima facie* case
of retaliation under Title VII, Plaintiff must [**27] es-
tablish that: "(1) [s]he engaged in activity protected by
Title VII; (2) the exercise of h[er] civil rights was known
to the defendant; (3) thereafter, the defendant took an
employment action adverse to [Plaintiff]; and (4) there
was a causal connection between the protected activity
and the adverse employment action." *Arendale* [*446]
*v. City of Memphis, 519 F.3d 587, 606 (6th Cir. 2008).*

Plaintiff has easily established the first two prongs.
First, because Title VII protects an employee who "com-
plain[s] to anyone (management, unions, other employ-
ees, or newspapers) about allegedly unlawful practices,"
her letters to Kirk and to the restaurant's general man-
ager, which complained about Kirk's allegedly harassing
activities, constitute protected activity. *See Johnson v.
Univ. of Cincinnati, 215 F.3d 561, 579 (6th Cir. 2000).*
Second, those letters also placed Defendants on notice
that Plaintiff was exercising her rights under Title VII.

Plaintiff also has established the third prong. Fol-
lowing the receipt of Plaintiff's letters, Defendants sus-
pended Plaintiff from her job for thirty days. Because the
suspension "would have 'dissuaded a reasonable worker
from making or supporting a charge of [**28] discrimi-
nation,'" *Niswander v. Cincinnati Ins. Co., 529 F.3d 714,
720 (6th Cir. 2008)* (quoting *Burlington, 548 U.S. at 68*),
Defendants' act of suspending Plaintiff constitutes an
adverse employment action for purposes of her Title VII
retaliation claim. *See Burlington, 548 U.S. at 56* (noting
that, for purposes of Title VII retaliation claims, an em-
ployer's action constitutes an adverse employment action
when "a reasonable employee would have found [the
action] materially adverse").

As a result, Plaintiff's retaliation claim turns on
whether a reasonable jury could find a causal connection
between Plaintiff's complaint and her suspension. At the
*prima facie* stage, a plaintiff must only "put forth some
evidence to deduce a causal connection between the re-
taliatory action and the protected activity." *Nguyen v.
City of Cleveland, 229 F.3d 559, 566 (6th Cir. 2000).*
When an employee is disciplined in close proximity to
his or her protected activity, such proximity provides
"highly probative evidence of a causal connection" be-
tween the adverse employment action and the protected
activity. *Arendale, 519 F.3d at 606.* We have often noted

that temporal proximity alone is not sufficient to support [**29] a retaliation claim, *e.g.*, *Nguyen, 229 F.3d at 566*, and that plaintiffs generally must show temporal proximity combined with "other compelling evidence" of retaliation to support their claims. *Id.* We have also acknowledged, however, that "there may be circumstances where evidence of temporal proximity alone would be sufficient to support [an] inference" of retaliation. *Id. at 567; see also Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 524-25 (6th Cir. 2008)* (discussing additional cases that have suggested temporal proximity alone is sufficient). Further, no case holds that "temporal proximity alone may *never* show a causal connection." *Mickey, 516 F.3d at 524* (emphasis added).

Most recently, this Court found that a plaintiff established a causal connection for purposes of his retaliation claim when he demonstrated that his employer fired him the same day the employer learned of his EEOC complaint. *Mickey, 516 F.3d at 525.* Thus, we concluded that, "where an employer fires an employee immediately after learning of the protected activity, we can infer a causal connection between the two actions, even if [the plaintiff] ha[s] not presented other evidence of retaliation." *Id.* In reaching [**30] its conclusion, this Court reasoned that temporal proximity must be sufficient to show retaliation "if an employer immediately retaliates against an employee upon learning of his protected activity" because, in such cases, "the employee would be unable to couple temporal proximity with any such other evidence because the two actions happened consecutively . . . ." *Id. at 525.*

[*447] This reasoning is equally applicable to Plaintiff's circumstances. Plaintiff's letters complaining of Kirk's alleged sexual harassment were delivered to Applebee's on March 9, 2006. Kirk suspended Plaintiff two days later. While a two-day lapse is not as close in time as the same-day termination in *Mickey,* Plaintiff, like the plaintiff in *Mickey,* is unlikely to be able to point to additional retaliatory conduct that occurred within the two-day window. [9] As a result, we conclude that this is one of the "limited number of cases" in which "we can

infer a causal connection . . . even [without] other evidence of retaliation." *Mickey, 516 F.3d at 525.*

9   In addition, it is not clear whether Plaintiff worked the same day the letters were delivered, or even the day after. A friend of Plaintiff delivered the letters to the [**31] restaurant; it is unclear whether Plaintiff was also working at the restaurant that day. If March 11, 2006, was the first opportunity Kirk had to retaliate against Plaintiff, Plaintiff's situation is indistinguishable from that in *Mickey. See Geiger v. Pfizer, Inc., No. 2:06-CV-636, 2008 U.S. Dist. LEXIS 89238, 2008 WL 4346781, at *8 (S.D. Ohio Sept. 18, 2008)* (finding that the plaintiff's retaliation claim survived summary judgment because, although four months passed between the protected activity and the alleged adverse employment action, the proximity was sufficiently "close," "especially considering that it was the first opportunity for such adverse action to be taken").

To rebut Plaintiff's *prima facie* case, Defendants argue only that no retaliatory action occurred because Kirk lacked authority to terminate Plaintiff. Kirk, however, disciplined Plaintiff and imposed a thirty-day suspension. As discussed above, the suspension constituted a materially adverse employment decision actionable under Title VII because the suspension would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Niswander, 529 F.3d at 720.* Thus, Plaintiff has presented sufficient evidence to allow [**32] a jury to find that she suffered an adverse employment action because of her complaints regarding Kirk's sexual harassment. Accordingly, we conclude that the district court improperly granted Defendants' motion for summary judgment with respect to Plaintiff's retaliation claim.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the decision of the district court and **REMAND** this case for trial.



LEXSEE 30 FED APPX 398

**Grace Idusuyi, Plaintiff-Appellant, v. State of Tennessee Department of Children's Services, Defendant-Appellee.**

No. 00-6324

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

*30 Fed. Appx. 398; 2002 U.S. App. LEXIS 2463*

February 11, 2002, Filed

**NOTICE:** [**1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** On Appeal from the United States District Court for the Middle District of Tennessee. 98-01162. Nixon. 08-24-00.

**DISPOSITION:** Affirmed.

**COUNSEL:** For GRACE IDUSUYI, Plaintiff - Appellant: Kathleen G. Morris, Karen L. Baker, Nashville, TN.

For STATE OF TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES, Defendant - Appellee: S. Elizabeth Martin, Office of the Attorney General, Rachel L. Steele, Asst. Atty. General, Tennessee Attorney General's Office, Nashville, TN.

**JUDGES:** Before: KENNEDY and DAUGHTREY, Circuit Judges; BELL, District Judge. *

* The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

**OPINION BY:** KENNEDY

**OPINION**

[*399] KENNEDY, Circuit Judge. Plaintiff Grace Idusuyi appeals the district court's judgment as a matter of law in this sexual harassment case. Idusuyi, an employee of the Tennessee Department [**2] of Children's Services ("DCS") at Woodland Hills, a secure juvenile correctional facility, applied for a higher-ranking position as director of the Nashville Transition Center, a different Department facility. After twice interviewing the Plaintiff, Albert Dawson, the DCS employee in charge of the search, contacted the highest ranking employee at Woodland Hills, Ken Currie, for an employment reference. Plaintiff did not receive the promotion.

Plaintiff filed a complaint in the United States district court charging quid pro quo and hostile environment sexual harassment, [*400] claiming that she was denied the promotion because of a negative reference from Currie. Idusuyi alleged that Currie gave her a negative reference because she refused to succumb to sexual advances he made from 1997 to 1998. The case was tried before a jury in August, 2000. At the close of Plaintiff's proof, Defendant made a motion for judgment as a matter of law under *Fed. R. Civ. Pro. 50*. The district judge reserved ruling on the motion until DCS had presented its defense. After the presentation of its case, DCS renewed its motion for judgment as a matter of law. The district court granted the motion. The court found [**3] that the Plaintiff had not demonstrated a tangible job detriment. Furthermore, the court found that DCS had a policy in place for the prevention of sexual harassment of which plaintiff unreasonably failed to take advantage, entitling DCS to a complete affirmative defense on her hostile environment sexual harassment claim under *Burlington Industries v. Ellerth, 524 U.S. 742, 141 L. Ed. 2d 633,*

30 Fed. Appx. 398, *; 2002 U.S. App. LEXIS 2463, **

*118 S. Ct. 2257 (1998)* and *Faragher v. City of Boca Raton, 524 U.S. 775, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998).*

We review *Rule 50* motions under "the same standard that the district court uses." *Hurt v. Coyne Cylinder Co., 956 F.2d 1319 (6th Cir. 1992).* We review de novo whether "during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Fed. R. Civ. Pro. 50(a)(1); Nida v. Plant Protection Ass'n Nat., 7 F.3d 522, 525 (6th Cir. 1993).* Applying this standard, we find no evidentiary basis to support Plaintiff's claim that she suffered a tangible job detriment as well as no basis to conclude that DCS lacked a [**4] preventative policy or that plaintiff took reasonable steps under the policy to alleviate her alleged harassment. No reasonable juror could have found for the Plaintiff given her failure to contradict the facts underlying DCS's affirmative defenses. Therefore, we affirm the District Court's judgment.

I. FACTS & ANALYSIS

In *Faragher* and *Ellerth*, two decisions released on the same day, the Supreme Court clarified when an employer would be held liable for sexual harassment committed by a supervisor. The Court suggested the distinction between "quid pro quo" and "hostile environment" sexual harassment was of limited utility, and redrew the test for vicarious liability. *Ellerth, 524 U.S. at 752.* On the one hand, where a supervisor effects a "tangible job detriment" against an employee under his or her authority, the employer would be liable. Even where the supervisor harasses an employee, but takes no tangible action against him or her, "the employer is still liable [for hostile environment sexual harassment] unless the employer affirmatively shows that it 'exercised reasonable care to prevent and correct promptly any sexually harassing behavior,' and that the [**5] plaintiff 'unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.'" *E.E.O.C. v. Harbert-Yeargin, 266 F.3d 498 (6th Cir. 2001)* (quoting *Ellerth* and *Faragher*).

Plaintiff presents a lengthy history of her relationship with Currie. If her version of the story is true, Currie certainly behaved inappropriately. However, under *Faragher* and *Ellerth*, our review of this appeal depends upon the facts proved at trial surrounding two issues. First, what facts were proved to suggest Plaintiff suffered a tangible job detriment because of Currie's harassment? Second, what facts were proved regarding DCS's sexual [*401] harassment policy and Plaintiff's efforts to avail herself of remedies provided by that policy?

A. TANGIBLE JOB DETRIMENT

An employer is liable for the sexual harassment of a supervisor against an employee under the supervisor's authority when the supervisor causes the harassed employee to experience a tangible job detriment, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change [**6] in benefits." *Ellerth, 524 U.S. at 761.* This is the case whether or not the employer has an anti-harassment policy in place. The problem Idusuyi faces in demonstrating a tangible job detriment is that the individual responsible for her harassment, Currie, had no formal role in determining whether or not she would receive the position as the director of the Nashville Transition Center.

Plaintiff claims that Currie's negative recommendation of her led directly to her failure to receive the director position. Br. at 33. Plaintiff applied for the position in response to a letter she received from Dawson after her name appeared on a civil service register (a list candidates who had expressed interest in positions of that type with the Department of Personnel and had the minimum qualifications for the position). App. at 200-03. Plaintiff does not claim that Dawson discriminated against her because of her sex or that he had any knowledge of Currie's conduct. Her claim is that Currie's recommendation to Dawson was responsible for her failure to obtain the promotion. The only evidence she relies on is the testimony of Dawson, who coordinated the search for the Transition Center's [**7] director.

Dawson testified that when he called Currie for a reference, Currie provided two pieces of information regarding the Plaintiff. First, that plaintiff had videotaped students, and second, that Plaintiff had brought her child to the Woodland Hills campus (both apparent violations of DCS policies). Dawson testified that the information provided by Currie was "critical" and "paramount" in his decision not to hire Plaintiff. App. at 212. Dawson testified that he "viewed the two incidents as very serious, especially in a secure facility where you have to constantly be aware of security and confidentiality . . . ." App. at 209.

Plaintiff argues that "Currie's motive in giving a bad reference . . . was to punish her for refusing his sexual advances . . . ." Br. at 38. Motive, however, does not prove that Currie's sexual harassment prevented her from receiving the position. In the context of racial discrimination, we have previously held that discriminatory animus on the part of a supervisor cannot be imputed to the supervisor's supervisor, but that plaintiffs had to show evidence that discriminatory motives influenced "the ultimate decision-makers." *Wilson v. Stroh's, Inc., 952 F.2d 942, 946 (6th Cir. 1992).* [**8] In *Wilson*, we also held that a discriminatory supervisor "bringing an employee's misconduct to [an ultimate decision-maker's] attention,

without more, is insufficient to support a prima facie case." *Id.* In *Stroh's*, we held that were a plaintiff to introduce evidence proving that a supervisor did not report identical misconduct by white employees, then a prima facie case of discrimination would be proved. We think that the same rule should apply in a sexual harassment context. Plaintiff has failed to introduce evidence that employees Currie was not allegedly harassing committed the same acts and yet received positive references.

Moreover, whatever Currie's own reason for relating the incidents, and whether or [*402] not his reference neglected to present a contextual view of Plaintiff as a good employee (Currie recalls his reference as otherwise a positive one and Dawson testified that Currie said Plaintiff was good with children), the incidents did in fact occur. Dawson's failure to do further investigation of these incidents (which might have led him to conclude, as plaintiff argues, that Currie misrepresented the seriousness of the behavior) bears no relation to Currie's [**9] sexual harassment.

Dawson decided not to offer the position to Plaintiff, not because of Currie's motives, but because of his own interpretation of what the two incidents said about Plaintiff's capacity to exercise the discretion, leadership and responsibility the promotion would involve. Dawson testified that he had been concerned about her lack of administrative experience even before contacting Currie. App. at 204. While Plaintiff's first interview (with Dawson) went well, her second (with Dawson, his supervisor, and his assistant) did not go as well. App. at 205. Thus there is the question of whether she would have been hired even if Dawson had not learned of those incidents. Once he heard of the two incidents, Dawson resolved not to continue exploring Plaintiff's candidacy. Plaintiff claims that videotaping students was not actually against department policy (and that she was asked to do so by her supervisor at Woodland Hills). Dawson's testimony, however, makes clear that he was not concerned that plaintiff violated policy, but rather that she acted without the discretion one would expect of the director of a Department facility. He was concerned that video taping infringed [**10] the confidentiality rights of the children and breached their rights to privacy.

Currie lacked the direct responsibility over whether or not the plaintiff received the promotion. Idusuyi cites *Hernandez-Loring v. Universidad Metro., 233 F.3d 49 (1st Cir 2000)*, in which a plaintiff won a vicarious sexual harassment case in which the supervisor who had harassed her was not single-handedly responsible for her promotion, but instead chaired a five-member committee which was responsible for making tenure decisions. "The gist of Hernandez-Loring's quid pro quo claim is that Diaz-Rivera made advances to her, was rebuffed, and then used his position as head of the committee to re-venge himself by blocking her promotion." *233 F.3d at 52*. Plaintiff suggests that case should lead to a finding for her, since the supervisor was not, on his own, empowered to deny Hernandez-Loring the position. However, unlike Diaz-Rivera, who had the power to vote on tenure candidates and significant opportunity to use his position as chair of the committee to control the discussion, Currie had *no* vote on whether or not Plaintiff was promoted, and only spoke to Dawson for a few minutes. [**11] In this case, Dawson exercised his own independent judgment, and, in part response to hearing true incidents related by Currie, declined to pursue Plaintiff's candidacy.

Plaintiff also relies upon a Seventh Circuit decision, *Molnar v. Booth, 229 F.3d 593, 600 (7th Cir. 2000)* for the proposition that a negative evaluation can provide the basis for a "tangible job detriment." *Molnar* involved significantly different circumstances. Molnar was a teaching intern, who was harassed by Booth, the school principal. Since Booth's signature and positive evaluation were required (though not sufficient) for Molnar's licensing, the principal's negative evaluation (which barred her from receiving a license)--coupled with his decision to remove art supplies from her control--constituted a tangible job detriment. Even then, it was a "close call." *Id.*

[*403] If a superior who has made sexual advances is not part of the chain of command that evaluates and determines whether a candidate receives a promotion, that superior's transmission of truthful if unflattering information does not constitute a tangible job detriment. We agree with the district court that Plaintiff has failed [**12] to prove a tangible job detriment. No reasonable jury could have found otherwise, and therefore judgment as a matter of law was appropriate.

## B. DCS'S POLICY AGAINST SEXUAL HARASSMENT

To succeed in an affirmative defense against a vicarious sexual harassment claim for a hostile environment, a defendant must show by a preponderance of the evidence that it exercised reasonable care in implementing a policy to prevent and correct sexual harassment and that the plaintiff unreasonably failed to take advantage of that policy. *Faragher, 524 U.S. at 806-807*. This defense is not available where the harassment culminated in a tangible employment action; however, the district court found no such action in Idusuyi's case and we affirm that finding. Therefore, DCS's policy on harassment and Idusuyi's use of the mechanisms provided for in that policy become relevant. The district court held that DCS was entitled to judgment as a matter of law on its affirmative defense that it had a policy aimed at combating sexual harassment of which plaintiff failed to avail herself. We agree.

30 Fed. Appx. 398, *; 2002 U.S. App. LEXIS 2463, **

DCS demonstrated that it had a reasonable policy regarding workplace sexual harassment. It had a written [**13] policy which stated its zero-tolerance approach to sexual harassment. App. at 242-244. This policy was disseminated on a computer server, sent to employees by e-mail, App. at 241, and was posted at job sites (including Woodland Hills). App. at 179. A multi-level grievance procedure was in place within DCS to allow employees to seek a remedy for harassment. In-service training included components on sexual harassment. App. at 329. The Plaintiff attended one such course, which included a two-hour segment on sexual harassment and the DCS policy towards it. App. at 186-193; *Id.* Plaintiff maintains that she never saw the sexual harassment policy, though she admits she knew one existed. App. at 119-120. We agree with the District Court that "reasonableness" does not require that every single employee know the intricacies of the policy. The DCS went to more than reasonable lengths to prevent and provide remedies for sexual harassment in its workplaces.

The Plaintiff, on the other hand, demonstrated an unreasonable failure to pursue a remedy through DCS's policy. She did not mention to a single co-worker that she had been harassed until after she had left Woodland Hills and the Nashville [**14] Transition Center position had been given to another candidate (after the compilation of a second civil service register). Though she admits she knew DCS had a sexual harassment policy, Plaintiff justifies her silence by claiming that she thought complaints would be futile because of Currie's relationship with DCS leaders. A similar claim was rejected by a district court in New York in a case concerning ethnic origin harassment. *See Fierro v. Saks Fifth Ave., 13 F. Supp. 2d 481 (S.D.N.Y. 1998).* In *Fiero,* the employer argued the plaintiff failed to take advantage of an employer's complaint procedure because of his "belief that management would not look favorably on a person who filed such complaints." *Id. at 492.* The District Court held that such an assertion did not create an issue of material fact and granted a motion for judgment as a matter of [*404] law. *Id.* We agree that it is unreasonable for employees to pass their own judgments--absent any supporting facts--about how effectively an employer's sexual harassment policies operate. The plaintiff knew of the existence of a sexual harassment policy, and her failure to pursue a remedy under that policy [**15] was unreasonable.

For the foregoing reasons, we affirm.



LEXSEE 2000 US APP LEXIS 1831

**DEBRAH LEUGERS, Plaintiff-Appellant, v. PINKERTON SECURITY AND IN-VESTIGATIVE SERVICES, Defendant-Appellee.**

**No. 98-3501**

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

*2000 U.S. App. LEXIS 1831*

**February 3, 2000, Filed**

**NOTICE:** [*1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *2000 U.S. App. LEXIS 7976.*

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO. 96-07788. Katz. 3-27-98.

**DISPOSITION:** Affirmed in part and cause remanded.

**COUNSEL:** For DEBRAH LEUGERS, Plaintiff - Appellant: Bruce B. Elfvin, Barbara Kaye Besser, Amy S. Glesius, Elfvin & Besser, Cleveland, OH.

For PINKERTON SECURITY AND INVESTIGATIVE SERVICES, Defendant - Appellee: Ricardo B. Teamor, Roy J. Schechter, Cheryl A. Mackey, Teamor & Associates, Cleveland, OH.

**JUDGES:** BEFORE: NORRIS and SUHRHEINRICH, Circuit Judges; RICE, District Judge. *

* The Honorable Walter Herbert Rice, United States District Judge for the Southern District of Ohio, sitting by designation.

**OPINION**

**PER CURIAM.** Plaintiff Debrah Leugers sued her former employer, defendant Pinkerton Security and Investigative Services, alleging sexual harassment. The district court granted summary judgment [*2] to defendant. Subsequently, the Supreme Court issued pertinent decisions in two sexual harassment cases, *Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998),* and *Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).* We now affirm in part and remand for further proceedings consistent with this opinion.

**I.**

Plaintiff was employed by defendant as a security guard at the Agco New Idea Plant in Coldwater, Ohio from September 1994 until her resignation in July 1996. When she began her employment, plaintiff read the Pinkerton's Officer's Manual. Plaintiff understood the policies explained in the manual and carried it at all times in her purse. The manual indicated that defendant had a strict policy prohibiting sexual harassment. Any employee who believed that he or she had been unlawfully discriminated against or harassed was instructed to "promptly report the incident, preferably in writing (within 48 hours), directly to his or her supervisor, District Manager or World Headquarters Employee Relations without fear of reprisal." According to the manual, all incidents would be [*3] thoroughly investigated and, when warranted, appropriate disciplinary action would

follow. Plaintiff was also aware of defendant's toll-free number called the "Alertline," which allowed any employee to report anonymously workplace problems, such as sexual harassment, to company management without having to submit a report to an immediate supervisor. Defendant's employees were periodically reminded about the Alertline through flyers included with their paychecks.

Before plaintiff was hired by defendant, another female security guard, Marilyn Shinn, had been fired. After she had been informed of her termination, Shinn reported to defendant's assistant manager of security in Dayton, Lawrence LaPrade, that she had been sexually harassed by Paul Braun, her supervisor at Agco. Upon investigation, LaPrade determined that there was insufficient evidence to support Shinn's allegations. An investigation by the EEOC also led to the same conclusion.

Plaintiff's supervisor at Agco was also Braun. From February to August of 1995, Braun subjected plaintiff to inappropriate touching and letters, including a forcible kiss. In August 1995, plaintiff reported Braun's behavior to Pinkerton management. [*4] Defendant immediately suspended Braun pending an investigation. Defendant terminated Braun approximately two weeks later upon conclusion of the investigation.

Plaintiff offered various reasons for her delay in reporting Braun's behavior. Plaintiff testified that "it was already made known to [her by Braun] about a female guard who did try to report it and when she did [plaintiff's] understanding was that Paul Braun was told to have her fired and [plaintiff] was not going to take that chance." Plaintiff also testified that Braun had warned her and her co-workers not to report anything to Pinkerton's Dayton or California offices, but to run any complaints through him first. Plaintiff also stated, however, that she did not complain to Pinkerton management because she "wanted to give [Braun] a chance to stop. [She] tried to resolve it [herself] without turning him in and having him fired."

Plaintiff also maintains that defendant ignored her complaint that she was subjected to an inappropriate touching by a co-worker, Jerry Everman.

Plaintiff's complaint consisted of two counts, alleging that defendant engaged in sex discrimination in violation of *Ohio Rev. Code § 4112.02* [*5] and negligently breached its common-law duty to provide her a safe work environment.

## II.

Plaintiff raised three allegations in the first count of her complaint: she reported an unwanted touching by a fellow security guard (Everman) and defendant did nothing; she was sexually harassed by Braun; and defendant was on notice that Braun was using his position to solicit sexual favors from employees before plaintiff was hired and yet did nothing to ensure plaintiff would not be subjected to sexual harassment. In the second count of her complaint, plaintiff raised a state common-law allegation that defendant's actions subjected her to an unsafe workplace. Each allegation will be addressed in turn.

### A. Count 1

#### 1. Unwanted Touching by Everman

Plaintiff correctly points out that the district court did not address defendant's failure to act on plaintiff's complaint regarding her sexual harassment by Everman, a fellow security guard. We will remand that claim to the district court for consideration in light of the standard set out by the Supreme Court in *Ellerth* and *Faragher*.

#### 2. Sexual Harassment by Braun

As for plaintiff's claim that she was sexually harassed by Braun, [*6] we reach the same result as the district court, but for a different reason. *See Babcock & Wilcox Co. v. Arkwright-Boston Mfg. Mut. Ins. Co., 53 F.3d 762, 767 (6th Cir.1995)* (holding circuit may affirm a grant of summary judgment on grounds other than those used by the district court). We review a grant of summary judgment de novo. *Toledo Ticket Co. v. Roadway Express, Inc., 133 F.3d 439, 441 (6th Cir. 1998)*.

Defendant is still entitled to summary judgment, even though the standard applied by the district court has been supplanted by *Ellerth* and *Faragher*. Under those cases:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, *see Fed. Rule Civ. Proc. 8(c)*. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, [*7] and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellerth, 118 S. Ct. at 2270*; *Faragher, 118 S. Ct. at 2292-93*. While *Ellerth* and *Faragher* involved sexual harassment claims under Title VII of the Civil Rights Act of 1964, the Ohio Supreme Court has determined that federal case law interpreting Title VII is generally applicable to cases involving allegations of sex discrimination in violation of Ohio law. *See Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n, 421 N.E.2d 128, 131, 66 Ohio St. 2d 192, 196 (Ohio 1981).*

The parties agreed for purposes of summary judgment that Braun's actions created a hostile working environment. Furthermore, at oral argument plaintiff conceded that no further discovery would be sought if the court remanded the case. Because no tangible employment action was taken, defendant can raise the affirmative defense set forth above.

First, defendant must show that it exercised reasonable care to prevent and correct promptly any sexually harassing [*8] behavior. The Supreme Court has indicated that "while proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense." *Ellerth, 118 S. Ct. at 2270*; *Faragher, 118 S. Ct. at 2293*. Defendant in this case has satisfied the first element of the affirmative defense by demonstrating that it had and distributed an anti-harassment policy with a complaint procedure in place that included ways to bypass an immediate supervisor in making a complaint. Furthermore, defendant promptly suspended Braun pending an investigation, then terminated him two weeks later.

Second, defendant must show that plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. The Supreme Court has elaborated that "unreasonable failure to use any complaint procedure provided by the employer . . . will normally suffice to satisfy the employer's burden." *Ellerth, 118 S. Ct. at 2270*; [*9] *Faragher, 118 S. Ct. at 2293*. In the present case, it is undisputed that plaintiff failed to follow defendant's complaint procedure. Furthermore, under the circumstances of this case, plaintiff's failure was unreasonable. Plaintiff deliberately ignored defendant's complaint procedure, despite provisions allowing her to avoid making her complaint to Braun. Furthermore, at least part of plaintiff's reason for failing to report Braun's behavior was not fear of reprisal, but because she wanted to give Braun a chance to stop without getting him fired. Defendant has satisfied the second element of the affirmative defense. Therefore, summary judgment was properly granted on plaintiff's claim that she was sexually harassed by Braun, albeit for a different reason than that set forth by the district court.

### 3. Notice of Braun's Behavior

Plaintiff's complaint also suggests that defendant was at fault for failing to take actions after being put on notice of Braun's behavior before plaintiff's report in August of 1995. This allegation raises the question of whether Shinn's complaint in 1992 gave defendant notice. Shinn's complaint did not put defendant on notice because defendant [*10] investigated the complaint and found no basis to conclude that harassment had occurred. Furthermore, plaintiff fails to point to anything in the record suggesting that defendant's conclusion with respect to Shinn's complaint was unfounded or illegitimate. In the circumstances of this case, summary judgment was appropriate on this claim.

### B. Count 2

Plaintiff also contends that summary judgment should not have been granted on her claim of negligent failure to provide a safe work environment, arguing that defendant had notice of Braun's behavior before she made her complaint. *See Kerans v. Porter Paint Co., 575 N.E.2d 428, 61 Ohio St. 3d 486 (Ohio 1991)* (syllabus). As discussed above, defendant did not have prior notice of Braun's behavior. The district court's grant of summary judgment regarding this count was correct.

### III.

For the foregoing reasons, the judgment of the district court is **affirmed** in part and the cause remanded for further proceedings consistent with this opinion.



LEXSEE 1998 US APP LEXIS 6659

**RACHEL MICHELLE STACY, Plaintiff-Appellant, v. SHONEY'S, INC., and PAUL KIMBRELL, Defendants-Appellees.**

No. 97-5393

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

*1998 U.S. App. LEXIS 6659*

**March 31, 1998, Filed**

**NOTICE:**    [*1]    NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 24 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 24 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:**    Reported in Table Case Format at: *1998 U.S. App. LEXIS 15816.*

**PRIOR HISTORY:**    ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY. 96-00018. Forester. 2-27-97.

**DISPOSITION:**    AFFIRMED.

**COUNSEL:** For RACHEL MICHELLE STACY, Plaintiff - Appellant: J. Randall Reinhardt, Charles W. Arnold, Reinhardt, Morgan, Arnold & Isaacs, Lexington, KY.

For SHONEY'S, INC., PAUL KIMBRELL, Defendants - Appellees: John A. West, Greenebaum, Doll & McDonald, Lexington, KY.

For SHONEY'S, INC., PAUL KIMBRELL, Defendants - Appellees: Richard S. Cleary, Greenebaum, Doll & McDonald, Louisville, KY.

**JUDGES:** BEFORE: KEITH, SUHRHEINRICH, and DAUGHTREY, Circuit Judges.

**OPINION**

**PER CURIAM:** Plaintiff employee Rachel Michelle Stacy appeals the denial of her motion to remand and the grant of summary judgment for Defendant employer Shoney's, Inc., ("Shoney's") on her state law claim of sexual harassment in employment. Plaintiff sued Shoney's and Paul [*2] Kimbrell, a Shoney's restaurant manager, in state court for sexual discrimination under the Kentucky Civil Rights Act ("KCRA"), *Ky. Rev. Stat. §§ 344.010-.990* (Banks-Baldwin 1997). Plaintiff alleged no violation of federal law. Defendants removed to federal court, even though Plaintiff and Defendant Kimbrell were both residents of Kentucky. Defendants argued that Kimbrell was "improperly and fraudulently joined" to defeat diversity. Plaintiff moved to remand. The district court denied the motion finding that Kimbrell was improperly joined, because Kimbrell, an employee of Shoney's, could not be personally liable for harassment under *§ 344.040*, which applies only to employers. The district court also found that Kimbrell's alleged misconduct was not sufficiently egregious to constitute harassment or discrimination as a matter of Kentucky law. Further, the district court found that Defendant Shoney's fulfilled its legal obligation as an employer to adequately stop Kimbrell's alleged harassment of Plaintiff by promptly investigating her complaint and prescribing remedial action. We **AFFIRM.**

**I. BACKGROUND**

Shoney's is a Tennessee corporation that operates restaurants throughout the [*3] United States, including

Kentucky. Plaintiff began working as a waiter at Shoney's Richmond Road restaurant on February 25, 1995. Within two months, she became a hostess, and had accepted the position of dining room manager. Plaintiff alleges that Kimbrell, the manager of the Richmond Road restaurant began harassing her with sexually suggestive comments and leering looks. Plaintiff and Kimbrell generally worked the same shifts, but when they did not work the same shift, Kimbrell would call Plaintiff at her home and tell her that he missed her. Plaintiff also claims that Kimbrell inappropriately touched her breast when he removed and replaced an ink pen from her front shirt pocket and said, "That's a nice pen." (J.A. at 105-06.)

Stacy reported Kimbrell's conduct to Robert Dorsey, Kimbrell's supervisor. Dorsey responded that she did the "right thing" by alerting him and assured her that her job was secure. Dorsey complied with Shoney's policies and procedures prohibiting sexual harassment, which direct its employees to report harassment and discrimination and requires Shoney's to promptly investigate and implement corrective procedures. Dorsey asked Plaintiff to write down Kimbrell's [*4] comments, which she did. The alleged comments included: "Your tan sure does look good I wish I could see more of it"; "I like it better when you wear your hair down"; "If [I] had someone that looked like you, I'd not let them leave the house"; and "I'd move in with you and take care of you." (J.A. at 120.) Dorsey also interviewed Kimbrell and seven female employees at the restaurant. Kimbrell admitted telling Plaintiff that her tan looked good, but denied the other comments. None of the other employees at the Richmond Road restaurant had any complaints of sexual harassment.

On April 25, 1995, Dorsey prepared a report stating that he was "unable to find any evidence to support the allegations of sexual harassment concerning Paul Kimbrell." (J.A. at 121.) Nevertheless, Dorsey stated in the report that he decided to "severely reprimand Paul Kimbrell as a result of the allegations" and would possibly terminate him if there were further allegations. The report also reflects that Shoney's offered Plaintiff continued employment with the choice of remaining at the Richmond store with the same position and pay or transferring to another store. (J.A. at 121.) Plaintiff reviewed the report, [*5] acknowledged her interview with Dorsey, and indicated her agreement with the decision. After speaking with Dorsey, Plaintiff also stated that she felt fine and that things were "great."

## II. DISCUSSION

### A. Remand

Plaintiff claims that the district court erred in denying her motion to remand the case to state court for fraudulent joinder of Kimbrell. Removability of an action is generally determined solely on the basis of the plaintiff's complaint. *Union Planters Nat'l Bank v. CBS, Inc., 557 F.2d 84, 89 (6th Cir. 1977).* Whether joinder is fraudulent does not depend on a party's subjective intent to defeat diversity jurisdiction but whether the complaint provides a reasonable basis for imposing liability on the non-diverse defendant. *Saylor v. General Motors Corp., 416 F. Supp. 1173, 1175 (E.D. Ky. 1976).*

Although Plaintiff alleged violations of the KCRA against Shoney's, which prohibits *employers* from discriminating on the basis of sex, Ky. Rev. Stat. § 344.040 (Banks-Baldwin 1997), she also named Kimbrell, an employee-supervisor, as a defendant. An "employer" is defined as "a person who has eight (8) or more employees . . . and an agent of such person." *Ky. Rev.* [*6] *Stat. § 344.030(2)* (Banks-Baldwin 1997). Because the KCRA is modeled on Title VII of the Civil Rights Act of 1964, 42 U.S.C., federal decisions interpreting the federal act are "most persuasive, if not controlling, in interpreting the Kentucky statute." *White v. Rainbo Baking Co., 765 S.W.2d 26, 28 (Ky. Ct. App.1988)* (quoting *Kentucky Comm'n on Human Rights v. Commonwealth, 586 S.W.2d 270, 271 (Ky. Ct. App. 1979)).* See also *Palmer v. Int'l Ass'n of Machinists and Aerospace Workers, 882 S.W.2d 117, 119 (Ky. 1994).*

The Sixth Circuit has held that an "individual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII" and has applied the same analysis to the Kentucky Civil Rights Act. *Wathen v. General Elec. Co., 115 F.3d 400, 405 (6th Cir. 1997)* Because Kimbrell was an employee-supervisor and not an employer, he would not be personally liable for a violation of § 344.040. *Id. at 405.*

Nevertheless, Plaintiff argues that Kimbrell is individually liable under the KCRA because § 344.280 prohibits a "person" from retaliating against an employee. In her complaint, Plaintiff simply alleged "unlawfully discriminatory [*7] practices" under § 344.280, without specifying retaliation. Nevertheless, Plaintiff has not presented any evidence of retaliation. Plaintiff also relies on *Palmer* in support of her claim that the KCRA allows a claim against an employee-supervisor. Plaintiff's reliance is misplaced. In *Palmer*, the issue involving employee-supervisors was not whether employees could be liable under § 344.280, but whether a criminal remedy under § 344.990 precluded civil liability under § 334.280. Thus, without a showing of retaliation, Kimbrell is not a proper party because there is no "reasonable basis for predicting that state law might impose liability on the facts involved." *Saylor, 416 F. Supp. at 1175* (quoting *Continental Oil Co. v. PPG Indus., Inc., 355 F.*

*Supp. 1183, 1186 (S.D. Tex. 1973))*. Accordingly, we **AFFIRM** the district court's denial of Plaintiff's motion to remand.

### B. Summary Judgment

Plaintiff also claims that the district court erred in finding no genuine issue of material fact that (1) Kimbrell's conduct, as a matter of law, did not create a hostile work environment and (2) Shoney's adequately responded to Plaintiffs claim of harassment.

The KCRA [*8] prohibits employees from discriminating "against [any] individual with respect to compensation, terms, conditions, or privileges of employment because of the individual's . . . sex." *§ 344.040(1)*. The KCRA is interpreted in line with Title VII. *Hall v. Transit Auth. of Lexington-Fayette Urban County Gov't., 883 S.W.2d 884, 886* (Ky. Ct. App., 1994); *Rainbo Baking Co., 765 S.W.2d at 28*. To establish a hostile environment, a plaintiff must show: (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the sexual harassment unreasonably interfered with her work performance and created an intimidating, hostile or offensive working environment; and (5) employer liability. *Kauffman v. Allied Signal Inc., 970 F.2d 178, 183 (6th Cir. 1992)* (citation omitted).

Not all offensive conduct is actionable as harassment. According to the Supreme Court, the conduct must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys. Inc., 510 U.S. 17, 20, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)* [*9] (quoting *Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986))*. Whether misconduct rises to the level of a hostile work environment is a legal question that may be decided on a summary judgment motion. *Blankenship v. Parke Care Centers, Inc., 913 F. Supp. 1045, 1051 (S.D. Ohio 1995) aff'd. 123 F.3d 868 (6th Cir. 1997), cert. denied, 140 L. Ed. 2d 105, 1998 U.S. LEXIS 899, 118 S. Ct. 1039 (1998)*. In determining whether or not the harassing conduct is "sufficiently severe or pervasive" to constitute actionable sexual harassment, courts consider the following factors: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Harris, 510 U.S. at 23*

Where an objectively hostile work environment exists, an employer is liable for sexual harassment if (1) the supervisor's conduct was foreseeable and fell within the scope of his duties, and (2) the employer failed to adequately respond. *Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 803 (6th Cir. 1994)*. However, if an employer [*10] responds adequately and effectively to stop the harassment when the employer learns of harassment, then the employer will not be liable for the harassment. *Kauffman, 970 F.2d at 184-85; Bouton v. BMW of N. Am., Inc., 29 F.3d 103, 110 (3d Cir. 1994)*.

We have reviewed both the record and the relevant case law including *Harris*, and *Black v. Zaring Homes, Inc. 104 F.3d 822 (6th Cir. 1997)*. In this case, Kimbrell's alleged comments were offensive, but not sufficiently frequent, severe, physically threatening, or humiliating to unreasonably interfere with Plaintiff's work performance to constitute actionable work place harassment. Accordingly, Plaintiff has not created a genuine issue of material fact that Kimbrell's conduct constituted a hostile work environment and summary judgment was proper.

Moreover, Defendant adequately responded by investigating the complaint, confronting Kimbrell, and assuring Plaintiff of her job. Whether Shoney's response effectively stopped the harassment became moot when Plaintiff found another job within two days after reporting Kimbrell. Nevertheless, even assuming that Kimbrell's conduct created an objectively hostile work environment, we [*11] find that Defendant adequately responded to stop the harassment and, therefore, is not liable for Kimbrell's alleged sexual harassment of Plaintiff.

### III. CONCLUSION

Accordingly, we **AFFIRM** the district court.